## GIROUARD *v.* UNITED STATES.

No. 572.   Argued March 4, 1946.—Decided April 22, 1946.

*Homer Cummings* and *William D. Donnelly* argued the cause for petitioner.   With them on the brief was *David J. Coddaire.*

*Frederick Bernays Wiener* argued the cause for the United States.   With him on the brief were *Solicitor General McGrath, Robert S. Erdahl* and *Leon Ulman.*

*Ernest Angell, Julien Cornell, John W. Davis* and *Osmond K. Fraenkel* filed a brief for the American Civil Liberties Union, as *amicus curiae,* in support of petitioner.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

In 1943 petitioner, a native of Canada, filed his petition for naturalization in the District Court of Massachusetts. He stated in his application that he understood the prin-

ciples of the government of the United States, believed in its form of government, and was willing to take the oath of allegiance (54 Stat. 1157, 8 U. S. C. § 735 (b)) which reads as follows:

"I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which I have heretofore been a subject or citizen; that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I take this obligation freely without any mental reservation or purpose of evasion: So help me God."

To the question in the application "If necessary, are you willing to take up arms in defense of this country?" he replied, "No (Non-combatant) Seventh Day Adventist." He explained that answer before the examiner by saying "it is a purely religious matter with me, I have no political or personal reasons other than that." He did not claim before his Selective Service board exemption from all military service, but only from combatant military duty. At the hearing in the District Court petitioner testified that he was a member of the Seventh Day Adventist denomination, of whom approximately 10,000 were then serving in the armed forces of the United States as non-combatants, especially in the medical corps; and that he was willing to serve in the army but would not bear arms. The District Court admitted him to citizenship. The Circuit Court of Appeals reversed, one judge dissenting. 149 F. 2d 760. It took that action on the authority of *United States* v. *Schwimmer,* 279 U. S. 644; *United States* v. *Macintosh,* 283 U. S. 605, and *United States* v. *Bland,* 283 U. S. 636, saying that the facts of the present case brought it squarely within the principle of those cases. The case is here on

a petition for a writ of certiorari which we granted so that those authorities might be re-examined.

The *Schwimmer, Macintosh* and *Bland* cases involved, as does the present one, a question of statutory construction. At the time of those cases, Congress required an alien, before admission to citizenship, to declare on oath in open court that "he will support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and bear true faith and allegiance to the same." [1] It also required the court to be satisfied that the alien had during the five-year period immediately preceding the date of his application "behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same." [2] Those provisions were reenacted into the present law in substantially the same form. [3]

While there are some factual distinctions between this case and the *Schwimmer* and *Macintosh* cases, the *Bland* case on its facts is indistinguishable. But the principle emerging from the three cases obliterates any factual distinction among them. As we recognized in *In re Summers,* 325 U. S. 561, 572, 577, they stand for the same general rule—that an alien who refuses to bear arms will not be admitted to citizenship. As an original proposition, we could not agree with that rule. The fallacies underlying

---

[1] Naturalization Act of 1906, § 4, 34 Stat. 596.

[2] *Id.*

[3] We have already set forth in the opinion the present form of the oath which is required. It is to be found in the Nationality Act of 1940, 54 Stat. 1137, 1157, 8 U. S. C. § 735 (b). Sec. 307 (a) of that Act, 8 U. S. C. § 707 (a), provides that no person shall be naturalized unless he has been for stated periods and still is "a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."

it were, we think, demonstrated in the dissents of Mr. Justice Holmes in the *Schwimmer* case and of Mr. Chief Justice Hughes in the *Macintosh* case.

The oath required of aliens does not in terms require that they promise to bear arms. Nor has Congress expressly made any such finding a prerequisite to citizenship. To hold that it is required is to read it into the Act by implication. But we could not assume that Congress intended to make such an abrupt and radical departure from our traditions unless it spoke in unequivocal terms.

The bearing of arms, important as it is, is not the only way in which our institutions may be supported and defended, even in times of great peril. Total war in its modern form dramatizes as never before the great cooperative effort necessary for victory. The nuclear physicists who developed the atomic bomb, the worker at his lathe, the seamen on cargo vessels, construction battalions, nurses, engineers, litter bearers, doctors, chaplains—these, too, made essential contributions. And many of them made the supreme sacrifice. Mr. Justice Holmes stated in the *Schwimmer* case (279 U. S. p. 655) that "the Quakers have done their share to make the country what it is." And the annals of the recent war show that many whose religious scruples prevented them from bearing arms, nevertheless were unselfish participants in the war effort. Refusal to bear arms is not necessarily a sign of disloyalty or a lack of attachment to our institutions. One may serve his country faithfully and devotedly, though his religious scruples make it impossible for him to shoulder a rifle. Devotion to one's country can be as real and as enduring among non-combatants as among combatants. One may adhere to what he deems to be his obligation to God and yet assume all military risks to secure victory. The effort of war is indivisible; and those whose religious scruples prevent them from killing are no less patriots than those whose special traits or handicaps result in their

assignment to duties far behind the fighting front. Each is making the utmost contribution according to his capacity. The fact that his rôle may be limited by religious convictions rather than by physical characteristics has no necessary bearing on his attachment to his country or on his willingness to support and defend it to his utmost.

Petitioner's religious scruples would not disqualify him from becoming a member of Congress or holding other public offices. While Article VI, Clause 3 of the Constitution provides that such officials, both of the United States and the several States, "shall be bound by Oath or Affirmation, to support this Constitution," it significantly adds that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." The oath required is in no material respect different from that prescribed for aliens under the Nationality Act. It has long contained the provision "that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion . . ." R. S. § 1757, 5 U. S. C. § 16. As Mr. Chief Justice Hughes stated in his dissent in the *Macintosh* case (283 U. S. p. 631), "the history of the struggle for religious liberty, the large number of citizens of our country, from the very beginning, who have been unwilling to sacrifice their religious convictions, and in particular, those who have been conscientiously opposed to war and who would not yield what they sincerely believed to be their allegiance to the will of God"—these considerations make it impossible to conclude "that such persons are to be deemed disqualified for public office in this country because of the requirement of the oath which must be taken before they enter upon their duties."

There is not the slightest suggestion that Congress set a stricter standard for aliens seeking admission to citizen-

ship than it did for officials who make and enforce the laws of the nation and administer its affairs. It is hard to believe that one need forsake his religious scruples to become a citizen but not to sit in the high councils of state.

As Mr. Chief Justice Hughes pointed out (*United States* v. *Macintosh, supra,* p. 633), religious scruples against bearing arms have been recognized by Congress in the various draft laws. This is true of the Selective Training and Service Act of 1940 (54 Stat. 889, 50 U. S. C. App. § 305 (g))[4] as it was of earlier acts. He who is inducted into the armed services takes an oath which includes the provision "that I will bear true faith and allegiance to the United States of America; that I will serve them honestly and faithfully against all their enemies whomsoever . . ." [5] 41 Stat. 809, 10 U. S. C. § 1581. Congress has thus recognized that one may adequately discharge his obligations as a citizen by rendering non-combatant as well as combatant services. This respect by Congress over the years for the conscience of those having

---

[4] Sec. 305 (g) provides in part:

"Nothing contained in this Act shall be construed to require any person to be subject to combatant training and service in the land or naval forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Any such person claiming such exemption from combatant training and service because of such conscientious objections whose claim is sustained by the local board shall, if he is inducted into the land or naval forces under this Act, be assigned to noncombatant service as defined by the President, or shall, if he is found to be conscientiously opposed to participation in such noncombatant service, in lieu of such induction, be assigned to work of national importance under civilian direction."

For earlier Acts see Act of February 24, 1864, 13 Stat. 6, 9; Act of January 21, 1903, 32 Stat. 775; Act of June 3, 1916, 39 Stat. 166, 197; Act of May 18, 1917, 40 Stat. 76, 78.

[5] And see *Billings* v. *Truesdell,* 321 U. S. 542, 549–550; Army Regulations No. 615–500, August 10, 1944, § II, 15 (f) (2).

religious scruples against bearing arms is cogent evidence of the meaning of the oath. It is recognition by Congress that even in time of war one may truly support and defend our institutions though he stops short of using weapons of war.

That construction of the naturalization oath received new support in 1942. In the Second War Powers Act, 56 Stat. 176, 182, 8 U. S. C., Supp. IV, § 1001, Congress relaxed certain of the requirements for aliens who served honorably in the armed forces of the United States during World War II and provided machinery to expedite their naturalization.[6] Residence requirements were relaxed, educational tests were eliminated, and no fees were required. But no change in the oath was made; nor was any change made in the requirement that the alien be attached to the principles of the Constitution. Yet it is clear that these new provisions cover non-combatants as well as combatants.[7] If petitioner had served as a non-

---

[6] Comparable provision was made in the Act of December 7, 1942, 56 Stat. 1041, 8 U. S. C., Supp. IV, § 723a, for those who served honorably in World War I, in the Spanish-American War, or on the Mexican Border.

[7] *In re Kinloch,* 53 F. Supp. 521, involved naturalization proceedings of aliens, one of whom, like petitioner in the present case, as a Seventh Day Adventist. He had been inducted into the army as a non-combatant. His naturalization was opposed by the Immigration Service on the ground that he could not promise to bear arms. The court overruled the objection, stating, p. 523:

"If conscientious objectors, who are aliens, performing military duty, and wearing the uniform, are not granted the privileges of citizenship under this act, then the act would be meaningless. It would be so made if an applicant, being a conscientious objector, who has attained the status of a soldier, performs military duty, and honorably wears the uniform (as is admitted in the instant cases), is denied citizenship. If the oath of allegiance is to be construed as requiring such applicant to agree, without mental reservation, to bear arms, then the result would be a denial of citizenship, even though Congress has conferred such privilege upon him."

And see *In re Sawyer,* 59 F. Supp. 428.

combatant (as he was willing to do), he could have been admitted to citizenship by taking the identical oath which he is willing to take. Can it be that the oath means one thing to one who has served to the extent permitted by his religious scruples and another thing to one equally willing to serve but who has not had the opportunity? It is not enough to say that petitioner is not entitled to the benefits of the new Act since he did not serve in the armed forces. He is not seeking the benefits of the expedited procedure and the relaxed requirements. The oath which he must take is identical with the oath which both non-combatants and combatants must take. It would, indeed, be a strange construction to say that "support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic" demands something more from some than it does from others. That oath can hardly be adequate for one who is unwilling to bear arms because of religious scruples and yet exact from another a promise to bear arms despite religious scruples.

Mr. Justice Holmes stated in the *Schwimmer* case (279 U. S. pp. 654–55): "if there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate. I think that we should adhere to that principle with regard to admission into, as well as to life within this country." The struggle for religious liberty has through the centuries been an effort to accommodate the demands of the State to the conscience of the individual. The victory for freedom of thought recorded in our Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State. Throughout the ages, men have suffered death rather than subordinate their allegiance to God to the authority of the State. Freedom of religion guaranteed by the First Amendment is the product of that struggle. As we

recently stated in *United States* v. *Ballard,* 322 U. S. 78, 86, "Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. *Board of Education* v. *Barnette,* 319 U. S. 624." The test oath is abhorrent to our tradition. Over the years, Congress has meticulously respected that tradition and even in time of war has sought to accommodate the military requirements to the religious scruples of the individual. We do not believe that Congress intended to reverse that policy when it came to draft the naturalization oath. Such an abrupt and radical departure from our traditions should not be implied. See *Schneiderman* v. *United States,* 320 U. S. 118, 132. Cogent evidence would be necessary to convince us that Congress took that course.

We conclude that the *Schwimmer, Macintosh* and *Bland* cases do not state the correct rule of law.

We are met, however, with the argument that, even though those cases were wrongly decided, Congress has adopted the rule which they announced. The argument runs as follows: Many efforts were made to amend the law so as to change the rule announced by those cases; but in every instance the bill died in committee. Moreover, when the Nationality Act of 1940 was passed, Congress reenacted the oath in its pre-existing form, though at the same time it made extensive changes in the requirements and procedure for naturalization. From this it is argued that Congress adopted and reenacted the rule of the *Schwimmer, Macintosh* and *Bland* cases. Cf. *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 488–489.

We stated in *Helvering* v. *Hallock,* 309 U. S. 106, 119, that "It would require very persuasive circumstances enveloping Congressional silence to debar this Court from reexamining its own doctrines." It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law. We do not think under the circumstances of this legislative history that we can properly

place on the shoulders of Congress the burden of the Court's own error. The history of the 1940 Act is at most equivocal. It contains no affirmative recognition of the rule of the *Schwimmer, Macintosh* and *Bland* cases. The silence of Congress and its inaction are as consistent with a desire to leave the problem fluid as they are with an adoption by silence of the rule of those cases. But, for us, it is enough to say that since the date of those cases Congress never acted affirmatively on this question but once and that was in 1942. At that time, as we have noted, Congress specifically granted naturalization privileges to non-combatants who like petitioner were prevented from bearing arms by their religious scruples. That was affirmative recognition that one could be attached to the principles of our government and could support and defend it even though his religious convictions prevented him from bearing arms. And, as we have said, we cannot believe that the oath was designed to exact something more from one person than from another. Thus the affirmative action taken by Congress in 1942 negatives any inference that otherwise might be drawn from its silence when it reenacted the oath in 1940.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE STONE, dissenting.

I think the judgment should be affirmed, for the reason that the court below, in applying the controlling provisions of the naturalization statutes, correctly applied them as earlier construed by this Court, whose construction Congress has adopted and confirmed.

In three cases decided more than fifteen years ago, this Court denied citizenship to applicants for naturalization who had announced that they proposed to take the pre-

scribed oath of allegiance with the reservation or qualification that they would not, as naturalized citizens, assist in the defense of this country by force of arms or give their moral support to the government in any war which they did not believe to be morally justified or in the best interests of the country. See *United States* v. *Schwimmer,* 279 U. S. 644; *United States* v. *Macintosh,* 283 U. S. 605; *United States* v. *Bland,* 283 U. S. 636.

In each of these cases this Court held that the applicant had failed to meet the conditions which Congress had made prerequisite to naturalization by § 4 of the Naturalization Act of June 29, 1906, c. 3592, 34 Stat. 596, the provisions of which, here relevant, were enacted in the Nationality Act of October 14, 1940. See c. 876, 54 Stat. 1137, as amended by the Act of March 27, 1942, c. 199, 56 Stat. 176, 182–183, and by the Act of December 7, 1942, c. 690, 56 Stat. 1041, 8 U. S. C. §§ 707, 735. Section 4 of the Naturalization Act of 1906, paragraph "Third," provided that before the admission to citizenship the applicant should declare on oath in open court that "he will support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and bear true faith and allegiance to the same." And paragraph "Fourth" required that before admission it be made to appear "to the satisfaction of the court admitting any alien to citizenship" that at least for a period of five years immediately preceding his application the applicant "has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same . . ." In applying these provisions in the cases mentioned, this Court held only that an applicant who is unable to take the oath of allegiance without the reservations or qualifications insisted upon by the applicants in those cases manifests his want of attachment to the principles of the Constitution and his unwillingness to meet

the requirements of the oath, that he will support and defend the Constitution of the United States and bear true faith and allegiance to the same, and so does not comply with the statutory conditions of his naturalization. No question of the constitutional power of Congress to withhold citizenship on these grounds was involved. That power was not doubted. See *Selective Draft Law Cases,* 245 U. S. 366; *Hamilton* v. *Regents,* 293 U. S. 245. The only question was of construction of the statute which Congress at all times has been free to amend if dissatisfied with the construction adopted by the Court.

With three other Justices of the Court I dissented in the *Macintosh* and *Bland* cases, for reasons which the Court now adopts as ground for overruling them.[1] Since this Court in three considered earlier opinions has rejected the construction of the statute for which the dissenting Justices contended, the question, which for me is decisive of the present case, is whether Congress has likewise rejected that construction by its subsequent legislative action, and has adopted and confirmed the Court's earlier construction of the statutes in question. A study of Congressional action taken with respect to proposals for amendment of the naturalization laws since the decision in the *Schwimmer* case, leads me to conclude that Congress has adopted and confirmed this Court's earlier con-

---

[1] In the opinion of the writer there was evidence in *United States* v. *Schwimmer,* 279 U. S. 644, from which the district court could and presumably did infer that applicant's behavior evidenced a disposition, present and future, actively to resist all laws of the United States and lawful commands of its officers for the furthering of any military enterprise of the United States, and actively to aid and encourage such resistance in others, and this the district court presumably concluded evidenced a want of attachment of the applicant to the principles of the Constitution which the naturalization law requires to be exhibited by the behavior of the applicant, preceding the application for citizenship.

struction of the naturalization laws. For that reason alone I think that the judgment should be affirmed.

The construction of the naturalization statutes, adopted by this Court in the three cases mentioned, immediately became the target of an active, publicized legislative attack in Congress which persisted for a period of eleven years, until the adoption of the Nationality Act in 1940. Two days after the *Schwimmer* case was decided, a bill was introduced in the House, H. R. 3547, 71st Cong., 1st Sess., to give the Naturalization Act a construction contrary to that which had been given to it by this Court and which, if adopted, would have made the applicants rejected by this Court in the *Schwimmer, Macintosh* and *Bland* cases eligible for citizenship. This effort to establish by Congressional action that the construction which this Court had placed on the Naturalization Act was not one which · Congress had adopted or intended, was renewed without success after the decision in the *Macintosh* and *Bland* cases, and was continued for a period of about ten years.[2] All of these measures were of substantially the same pattern as H. R. 297, 72d Cong., 1st Sess., introduced December 8, 1931, at the first session of Congress, after the decision in the *Macintosh* case. It provided that no person otherwise qualified "shall be debarred from citizenship by reason of his or her religious views or philosophical opinions with respect to the lawfulness of war as a means of settling international disputes, but every alien admitted to citizenship shall be subject to the same obligations as the native-born citizen." H. R. 3547, 71st Cong., 1st Sess.,

---

[2] H. R. 3547, 71st Cong., 1st Sess., 71 Cong. Rec. 2184; H. R. 297, 72d Cong., 1st Sess., 75 Cong. Rec. 95; H. R. 298, 72d Cong., 1st Sess., 75 Cong. Rec. 95; S. 3275, 72d Cong., 1st Sess., 75 Cong. Rec. 2600; H. R. 1528, 73d Cong., 1st Sess., 77 Cong. Rec. 90; H. R. 5170, 74th Cong., 1st Sess., 79 Cong. Rec. 1356; H. R. 8259, 75th Cong., 1st Sess., 81 Cong. Rec. 9193; S. 165, 76th Cong., 1st Sess., 84 Cong. Rec. 67.

introduced immediately after the decision in the *Schwimmer* case, had contained a like provision, but with the omission of the last clause beginning "but every alien." Hearings were had before the House Committee on Immigration and Naturalization on both bills at which their proponents had stated clearly their purpose to set aside the interpretation placed on the oath of allegiance by the *Schwimmer* and *Macintosh* cases.[3] There was opposition on each occasion.[4] Bills identical with H. R. 297 were introduced in three later Congresses.[5] None of these bills were reported out of Committee. The other proposals, all of which failed of passage (see footnote 2, *ante*), had the same purpose and differed only in phraseology.

Thus, for six successive Congresses, over a period of more than a decade, there were continuously pending before Congress in one form or another proposals to overturn the rulings in the three Supreme Court decisions in question. Congress declined to adopt these proposals after full hearings and after speeches on the floor advocating the change. 72 Cong. Rec. 6966–7; 75 Cong. Rec. 15354–7. In the meantime the decisions of this Court had been followed in *Clarke's Case*, 301 Pa. 321, 152 A. 92; *Beale* v. *United States*, 71 F. 2d 737; *In re Warkentin*, 93 F. 2d 42. In *Beale* v. *United States, supra*, the court pointed out that the proposed amendments affecting the provisions of the statutes relating to admission to citizenship had failed, saying: "We must conclude, therefore, that these statutory requirements as construed

---

[3] Hearings on H. R. 3547, pp. 12, 22, 29–57, 73–109, 169–180; Hearings on H. R. 297, pp. 4–7, 10, 12, 15–19, 41–48, 53–56, 66–81, 147, 148.

[4] Hearings on H. R. 3547, pp. 57–65, 73, 146–169, 181–212; Hearings on H. R. 297, pp. 85–140.

[5] H. R. 1528, 73d Cong., 1st Sess.; H. R. 5170, 74th Cong., 1st Sess.; H. R. 8259, 75th Cong., 1st Sess.

by the Supreme Court have congressional sanction and approval."

Any doubts that such were the purpose and will of Congress would seem to have been dissipated by the reenactment by Congress in 1940 of Paragraphs "Third" and "Fourth" of § 4 of the Naturalization Act of 1906, and by the incorporation in the Act of 1940 of the very form of oath which had been administratively prescribed for the applicants in the *Schwimmer, Macintosh* and *Bland* cases. See Rule 8 (c), Naturalization Regulations of July 1, 1929.[6]

The Nationality Act of 1940 was a comprehensive, slowly matured and carefully considered revision of the naturalization laws. The preparation of this measure was not only delegated to a Congressional Committee, but was considered by a committee of Cabinet members, one of whom was the Attorney General. Both were aware of our decisions in the *Schwimmer* and related cases and that no other question pertinent to the naturalization laws had been as persistently and continuously before Congress in the ten years following the decision in the *Schwimmer* case. The modifications in the provisions of Paragraphs "Third" and "Fourth" of § 4 of the 1906 Act show conclusively the careful attention which was given to them.

---

[6] Section 307 (a) of the Nationality Act, 8 U. S. C. § 707 (a), provides that no person shall be naturalized unless for a period of five years preceding the filing of his petition for naturalization he "has been and still is a person . . . attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." Section 335 (a) of the Nationality Act, 8 U. S. C. § 735 (a), provides that before an applicant for naturalization shall be admitted to citizenship, he shall take an oath in open court that inter alia he will "support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; . . . and . . . bear true faith and allegiance to the same . . ."

In the face of this legislative history the "failure of Congress to alter the Act after it had been judicially construed, and the enactment by Congress of legislation which implicitly recognizes the judicial construction as effective, is persuasive of legislative recognition that the judicial construction is the correct one. This is the more so where, as here, the application of the statute . . . has brought forth sharply conflicting views both on the Court and in Congress, and where after the matter has been fully brought to the attention of the public and the Congress, the latter has not seen fit to change the statute." *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 488–9. And see to like effect *United States* v. *Ryan,* 284 U. S. 167–175; *United States* v. *Elgin, J. & E. R. Co.,* 298 U. S. 492, 500; *Missouri* v. *Ross,* 299 U. S. 72, 75; cf. *Helvering* v. *Winmill,* 305 U. S. 79, 82, 83. It is the responsibility of Congress, in reenacting a statute, to make known its purpose in a controversial matter of interpretation of its former language, at least when the matter has, for over a decade, been persistently brought to its attention. In the light of this legislative history, it is abundantly clear that Congress has performed that duty. In any case it is not lightly to be implied that Congress has failed to perform it and has delegated to this Court the responsibility of giving new content to language deliberately readopted after this Court has construed it. For us to make such an assumption is to discourage, if not to deny, legislative responsibility. By thus adopting and confirming this Court's construction of what Congress had enacted in the Naturalization Act of 1906 Congress gave that construction the same legal significance as though it had written the very words into the Act of 1940.

The only remaining question is whether Congress repealed this construction by enactment of the 1942 amend-

ments of the Nationality Act. That Act extended special privileges to applicants for naturalization who were aliens and who have served in the armed forces of the United States in time of war, by dispensing with or modifying existing requirements, relating to declarations of intention, period of residence, education, and fees. It left unchanged the requirements that the applicant's behavior show his attachment to the principles of the Constitution and that he take the oath of allegiance. In adopting the 1942 amendments Congress did not have before it any question of the oath of allegiance with which it had been concerned when it adopted the 1940 Act. In 1942 it was concerned with the grant of special favors to those seeking naturalization who had worn the uniform and rendered military service in time of war and who could satisfy such naturalization requirements as had not been dispensed with by the amendments. In the case of those entitled to avail themselves of these privileges, Congress left it to the naturalization authorities, as in other cases, to determine whether, by their applications and their conduct in the military service, they satisfy the requirements for naturalization which have not been waived.

It is pointed out that one of the 1942 amendments, 8 U. S. C., Supp. IV, § 1004, provided that the provisions of the amendment should not apply to "any conscientious objector who performed no military duty whatever or refused to wear the uniform." It is said that the implication of this provision is that conscientious objectors who rendered noncombatant service and wore the uniform were, under the 1942 amendments, to be admitted to citizenship. From this it is argued that since the 1942 amendments apply to those who have been in noncombatant, as well as combatant, military service, the amendment must be taken to include some who have rendered

noncombatant service who are also conscientious objectors and who would be admitted to citizenship under the 1942 amendments, even though they made the same reservations as to the oath of allegiance as did the applicants in the *Schwimmer, Macintosh* and *Bland* cases. And it is said that although the 1942 amendments are not applicable to petitioner, who has not been in military service, the oath cannot mean one thing as to him and another as to those who have been in the noncombatant service.

To these suggestions there are two answers. One is that if the 1942 amendment be construed as including noncombatants who are also conscientious objectors, who are unwilling to take the oath without the reservations made by the applicants in the *Schwimmer, Macintosh* and *Bland* cases, the only effect would be to exempt noncombatant conscientious objectors from the requirements of the oath, which had clearly been made applicable to all objectors, including petitioner, by the Nationality Act of 1940, and from which petitioner was not exempted by the 1942 amendments. If such is the construction of the 1942 Act, there is no constitutional or statutory obstacle to Congress' taking such action. Congress if it saw fit could have admitted to citizenship those who had rendered noncombatant service, with a modified oath or without any oath at all. Petitioner has not been so exempted.

Since petitioner was never in the military or naval forces of the United States, we need not decide whether the 1942 amendments authorized any different oath for those who had been in noncombatant service than for others. The amendments have been construed as requiring the same oath, without reservations, from conscientious objectors, as from others. *In re Nielsen,* 60 F. Supp. 240. Not all of those who rendered noncombatant service were conscientious objectors. Few were. There were others in the noncombatant service who had announced their con-

scientious objections to combatant service, who may have waived or abandoned their objections. Such was the experience in the First World War. See "Statement Concerning the Treatment of Conscientious Objectors in the Army," prepared and published by direction of the Secretary of War, June 18, 1919. All such could have taken the oath without the reservations made by the applicants in the *Schwimmer, Macintosh* and *Bland* cases and would have been entitled to the benefits of the 1942 amendments, provided they had performed military duty and had not refused to wear the uniform. The fact that Congress recognized by indirection, in 8 U. S. C., Supp. IV, § 1004, that those who had appeared in the role of conscientious objectors, might become citizens by taking the oath of allegiance and establishing their attachment to the principles of the Constitution, does not show that Congress dispensed with the requirements of the oath as construed by this Court and plainly confirmed by Congress in the Nationality Act of 1940. There is no necessary inconsistency in this respect between the 1940 Act and the 1942 amendments. Without it repeal by implication is not favored. *United States* v. *Borden Co.,* 308 U. S. 188, 198–9, 203–6; *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439, 457; *United States Alkali Assn.* v. *United States,* 325 U. S. 196, 209. The amendments and their legislative history give no hint of any purpose of Congress to relax, at least for persons who had rendered no military service, the requirements of the oath of allegiance and proof of attachment to the Constitution as this Court had interpreted them and as the Nationality Act of 1940 plainly required them to be interpreted. It is not the function of this Court to disregard the will of Congress in the exercise of its constitutional power.

MR. JUSTICE REED and MR. JUSTICE FRANKFURTER join in this opinion.