**In re Petition for Naturalization of Parviz MEGHNOT.**

No. 284257.

United States District Court
E. D. Michigan, S. D.

Jan. 29, 1965.

**480**

Adolph F. Angelilli was the United States Naturalization Examiner, Detroit, Mich.

Petitioner was not represented by counsel.

LEVIN, Chief Judge.

The question presented in this case is whether the petitioner's adherence to the Baha'i faith and his membership in the organization of Baha'i, which is dedicated to an idealistic world federal system, disqualify him from taking the oath of citizenship.

The petitioner, Parviz Meghnot, filed a petition for naturalization on March 16, 1964, under Section 319(a) of the Immigration and Nationality Act, 8 U.S.C. § 1430. He is a native and national of Iran, 38 years of age, who has resided in the United States continuously since his admission for permanent residence on January 3, 1961. Being the husband of, and living with, his American-born wife, he is entitled to file a petition for naturalization after residence here for three years immediately preceding the date of the filing of the petition, 8 U.S.C. § 1430.

He was educated at, and received a Doctor of Medicine degree from, the University of Tehran, Iran, where he specialized in the subjects of Obstetrics and Gynecology. Since his residence in the United States he has received appointments, first as an intern and then as a resident in Gynecology and Obstetrics in four outstanding hospitals in the United States. Although not a citizen, he is licensed to practice his profession under an annual and renewable certificate issued by the appropriate licensing authorities of the State of Michigan. He will be eligible for a permanent license and also for certification for membership in the American Board of Gynecology and Surgery upon obtaining his citizenship.

The Oath of Allegiance required for citizenship is unqualified. 8 C.F.R. § 337.1. Under the provisions of Section 319(a) of the Immigration and Nationality Act, supra, and Section 316(a) of the Act (8 U.S.C. §§ 1430, 1427), the petitioner is required to establish that he has been attached to the principles of the Constitution of the United States and is well disposed to the good order and happiness of the United States since at least March 16, 1961.

The naturalization examiner recommended that the petition for naturalization be granted and that all the facts set forth in his recommendation be presented to the court. 8 C.F.R. § 335.13(b). In his findings of fact and conclusions of law and recommendation, the designated naturalization officer makes the following statement:

"Although the petitioner has stated he is willing now to take an unqualified oath of allegiance to the United States, his testimony not only raises a doubt that he can do so, but indicates clearly as well a mental conflict in his attitude in regards to his duty to the United States, his adopted country, and the future world government toward which he aspires."

The Baha'i religion affirmatively "requires that followers of the faith obey the government under which they live." It is not at all necessary to write ex-

haustively on the Baha'i movement and its place among the world's religions. In a word, the Baha'i originated in Persia (Iran) in 1844; and its teacher, Baha'u'-llah, set out rules of life which are similar to and found in the teachings of all great religions. Two of its fundamental principles are that there be ultimately one world of nations under a supreme tribunal and that, in the furtherance of world unity, the nations must choose a universal language to be used along with the languages of the respective nations in the world federation.

■ There is nothing in the philosophy, concepts, or basic tenets of the Baha'i faith which would prevent petitioner from taking the Oath of Allegiance to the United States without reservation. Nor does the fact that petitioner's religion requires him to make an effort to secure non-combatant status if called to serve in the armed forces raise a bar to acquisition of citizenship. Section 6(j) of the Selective Service Act of 1948 affirmatively recognizes that some individuals are opposed by religious training to participation in direct combat and permits such individuals to apply for non-combatant service. Congress enacted this Act and Section 337 of the Immigration and Nationality Act of 1952, Title 8 U.S.C. § 1448,[1] recognizing that citizens or residents of the United States who, by religious conviction, would be unwilling to bear arms in defense of the United States could nevertheless serve their country in non-combatant or civilian matters equally important to the defense of the nation. Mr. Justice Douglas, speaking for the Court in Girouard v. United States, 328 U.S. 61, 64, 66 S.Ct. 826, 827 (1946), said:

"The oath required of aliens does not in terms require that they promise to bear arms. Nor has Congress expressly made any such finding a prerequisite to citizenship. To hold that it is required is to read it into the Act by implication. But we could not assume that Congress intended to make such an abrupt and radical departure from our traditions unless it spoke in unequivocal terms.

\* \* \*

"Devotion to one's country can be as real and as enduring among non-combatants as among combatants. One may adhere to what he deems to be his obligation to God and yet assume all military risks to secure victory. The effort of war is indivisible; and those whose religious scruples prevent them from killing are no less patriots than those whose special traits or handicaps result in their assignment to duties far behind the fighting front. Each is making the utmost contribution according to his capacity. The fact that his role may be limited by religious convictions rather than by physical characteristics has no necessary bearing on his attachment to his country or on his willingness to support and defend it to his utmost."

1. Prior to the decision of the Supreme Court in the case of Girouard v. United States in 1946, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084, it was held that the oath of allegiance required as a prerequiste to naturalization that the petitioner promise to bear arms in defense of the United States. (See United States v. Schwimmer, 279 U.S. 644, 49 S.Ct. 448, 73 L. Ed. 889 (1929); United States v. Macintosh, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302 (1931); United States v. Bland, 283 U.S. 636, 51 S.Ct. 569, 75 L.Ed. 1319 (1931).) The Girouard decision, in effect, changed the accepted meaning of the oath so as to exclude the promise to bear arms in defense of the United States. The bill is designed to place the naturalized citizen in the same position as the native-born citizen by requiring the naturalized citizen to promise to bear arms on behalf of the United States when required by law, or to perform non-combatant service in the Armed Forces of the United States when required by law, or to perform work of national importance under civilian direction when required by law. House Committee Report No. 1365. U.S.Code and Congressional Service, 82nd Cong. 1952, Volume 2, p. 1741.

The Baha'i faith specifically states that a member must seek non-combatant service only if the law of the government to which he owes allegiance permits such action; and if the claim for exemption is denied, the faith recognizes the duty of its members to serve in any capacity to which they might be assigned. In fact, the faith specifically declares that each member owes to his particular government "the obligation for military service."

The petitioner, at his hearing before the designated naturalization examiner, testified that he would be true and loyal to the United States of America but that he did not believe in the actual killing of persons. He stated that a Baha'i believes in a supreme tribunal, to preserve a universal peace; that one day all the nations of the world would be under that one supreme tribunal composed of representatives elected to that tribunal from all member nations and countries; and that this tribunal would rule under international law. The belief of the Baha'i is that if a nation should rise up against the world government, the other nations would be justified in taking punitive action against the aggressor or offender.

In the petitioner's opinion, this would eventually lead to universal peace and a oneness of mankind, but the petitioner affirms over and over again his primary allegiance to the United States and that if he were required, in spite of this belief, to bear arms on behalf of the United States, he would do so:

"On the contrary, if the United States says you have to do it, then I will obey the United States Government. We believe in the unity— in getting along with everyone. We want the world to be a universal house of justice. We believe in obeying but not willful killing. Any country you go to, you have to obey the laws if you want to get along. We believe in world peace but if I am told by United States Government to carry arms on behalf of the United States, I will obey—no other choice. That is my explanation."

Obviously, the espousal of a form of government, the principles of which are incompatible with those in the United States Constitution, conflicts with the obligations, duties, and responsibilities of American citizenship. However, the petitioner is avowedly well disposed to the good order and happiness not only of his country but of the world. He is attached to the principles of free government which are embodied in the Constitution of the United States.

As citizens of the United States, we have demonstrated our belief in the attainment of world peace through the joint action of sovereign states by strongly supporting the United Nations.

"For when if the world's people set out in earnest to form a world government, they will find in the U.N. a logical starting point.

\* \* \* \* \* \*

"It must continue to use its admittedly underdeveloped powers as far as it is possible to use them day by day. In the kind of world we are living in, no substitute organization of sovereign states could do more than the U.N. is doing today.

\* \* \* \* \* \*

"The world desperately needs the center of balance which only the U.N. can give. That is why the United States gives unfaltering support to the United Nations and to the search for ways to strengthen the authority and effectiveness of that system." [2]

In any event, allegiance owed by members of the Baha'i faith to any contemplated world government does not arise until such a government is created and then only through the consent of sovereign nations. The establishment of a world government presupposes the volun-

2. Department of State Publication 3929, International Organization and Conference Series III, 52; Released August 1950, U. S. Government Printing Office.

tary agreement of every government to its formation. In such an eventuality, the citizens of each individual government or nation within the world federation would owe certain duties and obligations to the world federation and be subject to the powers granted to it by the voluntary agreement of its members. Any agreement or treaty on the part of the United States would have to be in accordance with the Constitution of the United States, which provides that all treaties must be ratified by the Senate of the United States, Article II, Section 2.

I am satisfied that the petitioner may take the Oath of Allegiance to the United States and that he can foreswear all allegiance with no mental reservation. Unlike the facts dealt with in Knauer v. United States, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500 (1946), the petitioner will have no divided political allegiance and he can in good faith and will, without reservation and compromise, willingly perform duties inherent in allegiance to the United States.

The oath may be administered.