## Ramadass Naturalization Petition.

Argued May 24, 1971. Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

88

*Arthur L. Berger,* for appellant.

*Laurence M. Kelly,* Assistant United States Attorney, with him *S. John Cottone,* United States Attorney, for appellee.

OPINION BY MR. JUSTICE ROBERTS, October 12, 1971:

This appeal from an order of the Dauphin County Court of Common Pleas denying a petition for naturalization poses an issue of statutory construction concerning the Immigration and Naturalization Act of 1952, as amended, 8 U.S.C. §§1101 et seq. Specifically, we are called upon to determine the extent to which the statutorily prescribed oath of renunciation and allegiance makes allowance for conscientious reservations. Upon reviewing the record before us and in light of the relevant legal authorities, we conclude that Congress did not intend to deny the privileges of United States citizenship to one possessing the moral scruples of the sort expressed by appellant in this case.

The instant case arises as follows:

Appellant Venkataraman Ramadass, a native of India, entered the United States on June 25, 1964, to enroll in Pennsylvania State University as a graduate student. Following the completion of his studies at that institution, he entered upon employment with the Pennsylvania Department of Health as an air pollution control engineer.

On August 28, 1967, appellant filed a petition for naturalization. The Immigration and Naturalization Service conducted preliminary investigations and oral examinations of appellant as required by law and thereafter issued a report recommending that naturalization be denied. Appellant then claimed his statutory right to a *de novo* hearing, 8 U.S.C. §1447.

Such a hearing was held in the Court of Common Pleas of Dauphin County on December 10, 1969, at

which time appellant appeared and testified as a witness in his own behalf and produced other witnesses whose testimony substantially covered the entire period of his residence in the United States. The government for its part introduced no evidence other than the record of the prior administrative proceedings before the Immigration and Naturalization Service. By opinion and order dated May 29, 1970, the court of common pleas denied the petition for naturalization, and this appeal followed.

It was the government's original position in this case that appellant's petition for naturalization was deficient in three respects. It contended that he had not adequately demonstrated his attachment to the principles of the Constitution; that he had not sufficiently proven his eligibility to take the conscientious objector version of the oath of renunciation and allegiance; and, finally, that he could not, as required, promise in good faith to perform work of national importance under civilian direction. Although the government has now apparently abandoned the first two grounds, and the court of common pleas based its decision denying naturalization solely on the third ground, we must discuss all three asserted defects in appellant's petition. This is so because this appeal is in the nature of a broad certiorari,[1] the record so permits, and our present resolution of all three issues will conclude the matter.

---

[1] Section 310 of the Immigration and Naturalization Act of 1952, as amended, 8 U.S.C. §1421, confers jurisdiction upon the courts of the various states to entertain applications for naturalization. There is no statutory provision governing appeals. It is settled, however, that "where a court of record of this state refuses an application for naturalization, an appeal in the nature of a certiorari is of right. This Court will examine the record in its broadest sense to determine the fundamental questions involved . . . ." *Schulz Naturalization Case*, 384 Pa. 558, 562, 121 A. 2d 164, 166 (1964). See also *Clarke's Case*, 301 Pa. 321, 152 Atl. 92 (1930).

## A. Attachment to the Constitution

The Immigration and Naturalization Act of 1952 provides that no person shall be naturalized unless he is ". . . attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." 8 U.S.C. §1427(a). Reflecting its plain and ordinary meaning, the phrase "attached to the principles of the Constitution" has been held to mean belief in representative democracy, a commitment to the ideals of the Bill of Rights, and a willingness to accept the basic social premise that change be effected in an orderly manner. *Stasiukevich v. Nicolls*, 168 F. 2d 474 (1st Cir. 1948). Similarly, the requirement of a favorable disposition to the good order and happiness of the United States is deemed to connote a belief in the political processes of the United States, a general satisfaction with life in the United States, and a hope for future progress and prosperity. *In re Van Laeken*, 22 F. Supp. 145 (N.D. Cal. 1938). Consonant with this nation's revolutionary birth and its history of evolutionary social progress, neither of these requirements has been thought to preclude a belief that change within constitutional limits is desirable. *United States v. Rovin*, 12 F. 2d 942 (E.D. Mich. 1926).

In the course of his testimony in the court of common pleas, appellant professed his belief in democracy generally and in the system of government provided for by the Constitution, his desire to be a good and responsible citizen, and his concern for the welfare of the United States. He stated that he had belonged to the American Civil Liberties Union, the Center for the Study of Democratic Institutions, the Friends of India Association, and several other student groups, and declared that his association with these organizations was

not inconsistent with his adherence to the principles of the Constitution. Appellant's own testimony was corroborated by that of several other witnesses who, in addition to testifying as to appellant's sincerity, extensively described his interest in civic and world affairs, the qualities he would exhibit as a United States citizen and his belief in the Constitution.

In sum, the uncontradicted record would permit no finding other than that appellant is fully attached to the principles of the United States Constitution and well disposed to the welfare and happiness of the United States.

## B. Eligibility for the Conscientious Objector Oath

In order to be admitted to citizenship, a person who has petitioned for naturalization must take a five part oath of renunciation and allegiance, promising: ". . . (1) to support the Constitution of the United States; (2) to renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which the petitioner was before a subject or citizen; (3) to support and defend the Constitution and the laws of the United States against all enemies, foreign and domestic; (4) to bear true faith and allegiance to the same; and (5) (A) to bear arms on behalf of the United States when required by the law, or (B) to perform noncombatant service in the Armed Forces of the United States when required by the law, *or (C) to perform work of national importance under civilian direction when required by the law. . . .*" 8 U.S.C. §1448 (emphasis added).

The statute continues by providing that: ". . . Any such person shall be required to take an oath containing the substance of clauses (1) to (5) of the preceding sentence, except that . . . a person who shows by clear and convincing evidence to the satisfaction of the

naturalization court that he is opposed to any type of service in the Armed Forces of the United States by reason of religious training and belief shall be required to take an oath containing the substance of clauses (1) to (4) and clause (5)(C). The term 'religious training and belief' as used in this section shall mean an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code. . . ."

The definition of "religious training and belief" in the above statute must, of course, be read in light of the United States Supreme Court's decision in *United States v. Seeger*, 380 U.S. 163, 85 S. Ct. 850 (1965), which construed an identical provision in Section 6(j) of the Universal Military Training and Service Act, 50 U.S.C. App. §456(j), dealing with conscientious objection. After analyzing the text and history of Section 6(j) and in order to avoid imputing to Congress an intent to classify and discriminate among different religious beliefs, the Court in *Seeger* concluded that "religous training and belief" meant "[a] sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption. . . ." Id. at 176, 85 S. Ct. at 859.[2] It is thus in light of the test enunciated in *Seeger* that we must assess appellant's eligibility to take the "civilian work" version of the oath of renunciation and allegiance.

The witnesses who appeared in appellant's behalf included his wife, a friend, a former landlady, a minister from Pennsylvania State University, a Chemistry Pro-

---

[2] Subsequent to *Seeger*, Congress amended the Universal Military Training and Service Act to eliminate the reference to a "Supreme Being."

fessor from Pennsylvania State University, a Philosophy Professor from C. W. Post College, and a Professor of Religion from Dickinson College who testified as an expert regarding Hinduism, the theology in which appellant was raised.

The Religion Professor testified that the concept of deity in Hinduism differed remarkedly from the concept of a Supreme Being in most western religions. He stated that one could be a practicing Hindu and believe in the existence of one God, many Gods or no God, the hallmark of Hinduism being rather a belief in the existence of a universal moral order. All of the witnesses who were familiar with appellant's pacifistic beliefs testified as to the depth and extent of those beliefs and indicated their opinion that those beliefs occupied a place in his life as strong and meaningful as the beliefs of members of many other orthodox religious sects common to the United States. Finally, all of the witnesses who knew appellant personally testified favorably as to his general sincerity.

Appellant himself testified that although he had been raised in a very religious home he was an agnostic. He stated that his abhorrence of the use of violence had been deeply influenced and largely brought about by his study of the teachings of Jesus Christ, Ghandi, and Buddha, and through his association with certain Quakers in the United States. He asserted that in his view the killing of another human being could never be justified.

There is nothing of record to cast the slightest shadow of suspicion over appellant's sincerity or the credibility of his witnesses. Thus, although the court of common pleas did not pass upon the issue, we have no hesitation in concluding that appellant has shown by clear and convincing evidence that he is opposed to any type of military service by reason of religious train-

ing or belief. See *United States v. Seeger,* supra; cf. *Welsh v. United States,* 398 U.S. 333, 90 S. Ct. 1792 (1970).

### C. Ability To Take the Oath in Good Faith

We are brought to the real center of controversy in this case, namely, whether appellant can swear in good faith "to perform work of national importance under civilian direction when required by the law." 8 U.S.C. §1448.

In the course of his hearing in the court of common pleas, appellant declared his willingness to take the required oath, including a promise to perform civilian work as directed. By way of explanation, he testified further that he was generally familiar with the sort of work normally required of conscientious objectors, that he would be willing to engage in any such work, and that he harbored no present reservations with respect to any future work that might be required so long as it was not "in the military area." Finally, in response to a specific question by his counsel, appellant stated that he would not accept employment in a munitions factory.

On cross-examination, the United States Attorney and the hearing judge inquired of appellant as follows: "Q. Do you feel that you should make a judgment at the time you are asked to do this work, civilian work of national importance, whether or not it comes within the quality of work that you have in mind to do? A. It has to be work that I can do, that my conscience will permit me to do, yes. Q. And suppose that you were asked to do something that your conscience felt would not let you do. Do you feel that you would do it then, if you were required to do so by law? A. If my conscience told me don't do it, I will not do it. . . . THE COURT: As I understand it then, the gist of your

testimony is that you would be the final judge as to what non-combatant work you would perform. THE WITNESS: Yes, sir. I have to admit it to my conscience before I do. My conscience must permit me to do it before I do it."

Solely on the basis of the foregoing answers, the court of common pleas denied the petition for naturalization on the theory that an applicant for citizenship must take the oath by allegiance in strict accordance with the terms fixed by law and without any qualifications or reservations.[3] We believe that this conclusion was erroneous.

The decision of the United States Court of Appeals for the Seventh Circuit in *Thompson v. Immigration and Naturalization Service,* 332 F. 2d 167 (1964), is persuasive and directly in point. The petitioner in that case, a former member of the Industrial Workers of the World (IWW), sought naturalization and expressed his willingness to swear allegiance to and bear arms on behalf of the United States. At a hearing in the United States District Court, the government's attorney attempted to explore the implications of petitioner's association with the IWW. Specifically, petitioner was asked whether he would abide by his oath to bear arms on behalf of the United States against Australia in the event that the IWW were to gain control of the Australian government. Petitioner equivocated at first and, when pressed, finally admitted that he "would have to cross that bridge when [he] came to it." On the basis of this answer the District Court denied naturalization. On appeal, the Court of Appeals reversed and remanded the record with instructions to issue the certificate of naturalization.

---

[3] The government does not contend that appellant's stated refusal to work in a munitions plant would disqualify him from naturalization. See *Petition of Scaccio,* 131 F. Supp. 154 (N.D. Cal. 1955), rev'd, 235 F. 2d 782 (9th Cir. 1956).

The instant case presents a situation significantly similar to that in *Thompson*. Like the petitioner in that case, appellant stands ready to take the required oath, and, in addition, he has stated that he knows of no civilian work that he would be unwilling to perform. When asked categorically about unspecified future work that he might be directed to do, he responded in effect that he would have to cross that bridge when he came to it, depending upon whether or not that work was consonant with his conscientious scruples. There does not appear to be any greater likelihood that appellant will be asked to perform morally unacceptable work than that the petitioner in *Thompson* would be ordered to bear arms in circumstances in which he could not obey.

The cases relied upon by the court of common pleas and those additional ones cited by the government in this appeal are distinguishable.

The most recent of such decisions, *In re Matz*, 296 F. Supp. 927 (E.D. Cal. 1969), involved the denial of the naturalization petitions of two Jehovah's Witnesses on the alternative grounds (1) that they had not shown themselves to be attached to the principles of the Constitution and (2) that they could not in good faith swear to perform civilian work of national importance as required by law. As to the oath issue, the court noted that petitioners had stated that they would only perform work which was in their view not inconsistent with their religious beliefs and if the orders to perform such work did not issue from a draft board. Inasmuch as all orders to report for civilian work do in fact emanate from draft boards, it was a virtual certainty that petitioners, if naturalized, would not be able to abide by the terms of the oath. In contrast, the present record does not even give rise to a substantial probability that appellant would ever be ordered to submit to morally unacceptable work.

This same factor also serves to distinguish the decision of this Court in *Clarke's Case,* 301 Pa. 321, 152 Atl. 92 (1930). There, naturalization was denied to one who would agree to undertake the commitments contained in the oath of allegiance only "so far as they are in accord with the moral law of Jesus Christ." In retrospect, the decision in *Clarke* appears open to serious question, but in any event this Court was convinced that the petitioner in that case would not support or defend some of the laws of the United States. In the instant case, appellant testified to the contrary that he knew of no laws of this country that were repugnant to his moral sensibilities.

Finally, we note that the three United States Supreme Court decisions relied upon by the government are of no present persuasiveness and authority in this case. In *United States v. Bland,* 283 U.S. 636, 51 S. Ct. 569 (1931), citizenship was denied to a person who would take the oath only with the reservation "as my conscience as a Christian will allow." In *United States v. Macintosh,* 283 U.S. 605, 51 S. Ct. 570 (1931), citizenship was denied to a person who would bear arms only if the war was morally justified. And in *United States v. Schwimmer,* 279 U.S. 644, 49 S. Ct. 448 (1929), citizenship was withheld from one who failed to prove that his expressed pacifistic beliefs would not conflict with his oath of allegiance. The United States Supreme Court stated that these decisions merely stood for the general proposition that an alien who refuses to bear arms will not be admitted to citizenship, and all three decisions were specifically overruled. See *Girouard v. United States,* 328 U.S. 61, 66 S. Ct. 826 (1946).

Delivering the opinion of the Court in *Girouard,* Mr. Justice DOUGLAS reasoned as follows: "The test oath is abhorrent to our tradition. Over the years

Congress has meticulously respected that tradition and even in time of war has sought to accommodate the military requirements to the religious scruples of the individual. We do not believe that Congress intended to reverse that policy when it came to draft the naturalization oath. Such an abrupt and radical departure from our traditions should not be implied. . . . Cogent evidence would be necessary to convince us that Congress took that course." Id. at 69, 66 S. Ct. at 829-30.

The foregoing passage aptly summarizes the spirit with which we approach this case. This nation has always been profoundly dedicated to the universal rights of man, and our very Declaration of Independence declares it self-evident that all men "are endowed by their Creator with certain unalienable Rights." We can scarcely conclude that the elected national representatives of such a nation intended to deny citizenship to an otherwise qualified and worthy individual merely because he expresses the view that he can *conceive* that there might be some laws so abhorrent to his conscience that he could not obey them.

The order of the Court of Common Pleas of Dauphin County is reversed and the record remanded with instructions to enter an appropriate order granting appellant's petition for naturalization.

Mr. Justice JONES and Mr. Justice EAGEN concur in the result.