[S. F. Nos. 17263, 17264.   In Bank.   Feb. 18, 1947.]

ROSEMARY PROPERTIES, INC. (a Corporation), Respondent, v. CHARLES J. McCOLGAN, as Franchise Tax Commissioner, etc., Appellant.

(Two Cases.)

Robert W. Kenny, Attorney General, John L. Nourse and James E. Sabine, Deputy Attorneys General, for Appellant.

Latham & Watkins and Austin H. Peck, Jr., for Respondent.

Mackay, McGregor & Reynolds and Martin J. Weil, as Amici Curiae on behalf of Respondent.

SPENCE, J.—Two actions were brought by plaintiff to recover additional franchise taxes assessed by defendant against plaintiff for the years 1938 and 1939, respectively. They were tried upon a stipulated set of facts, and they have been briefed together on appeal in presenting a problem of statutory construction affecting the propriety of a dividend deduction for franchise tax purposes for the two years in question, under the terms of the Bank and Corporation Franchise Tax Act (Stats. 1929, ch. 13, p. 19, as amended; Deering's Gen. Laws, 1937, Act 8488), hereinafter referred to as "the act." The trial court entered a judgment in favor of plaintiff in each case and from said judgments, defendant has appealed.

Plaintiff, a California corporation, duly filed its franchise tax returns for the years 1938 and 1939, the former based on its 1937 income and the latter on its 1938 income. Plaintiff's report of gross income for these successive years listed $76,195 and $83,545 as dividends paid to it respectively in 1937 and 1938 by the Ventura Land and Water Company, hereinafter referred to as "Ventura." However, in computing its net income for franchise tax purposes for those years, plaintiff deducted the full amount of the respective Ventura dividends from its returns. As a result of that deduction and other deductions not here involved, plaintiff reported a net loss for each year and paid a minimum tax of $25 on each of its returns as required by section 4(3) of the act.

In due season defendant served notices on plaintiff of his intention to assess an additional franchise tax for each of the two years. Plaintiff protested the proposed assessments but paid them with interest, after which these actions followed to recover the additional assessments charged and collected by defendant by reason of his adjustment of the Ventura dividend deduction taken by plaintiff on each of its returns. This disputed item will determine whether or not plaintiff's franchise tax obligation for each of the two years exceeds the minimum $25 assessment as originally reported. In order to appraise the factors in controversy, it is necessary to examine the franchise tax returns filed by Ventura for the corresponding years.

Ventura, a California corporation, conducted its entire business in this state. Its principal source of income was royalties from California oil and gas properties, which it owned and leased to operating oil producers. Ventura's gross income

for the year 1937—as reported on its 1938 return—was $1,203,-295.60 and for the year 1938—as reported on its 1939 return —was $1,417,090.48, of which sums $1,195,768.97 and $1,399,-534.92 were derived, respectively, from its oil royalties. Prior to 1937 Ventura had recovered in full its cost depletion for its oil-bearing lands. But in pursuance of section 8(g) of the act, which authorizes a deduction for depletion at the rate of 27½ per cent of the gross income from oil and gas wells, Ventura listed, and was allowed, on its respective returns a deduction of $328,836.47 from its oil royalties for 1937 and a deduction of $384,872.10 from its oil royalties for 1938. These respective percentage depletions on its oil royalties and other allowable deductions reduced Ventura's net income for franchise tax purposes for 1937 to $775,282.65 and for 1938 to $908,171.54. It was stipulated that Ventura's earnings and profits for the year 1937 amounted to $963,338.63 and for the year 1938 amounted to $1,112,147.82, from which sums came the respective dividends of $76,195 and $83,545 paid plaintiff.

As the basis for the additional franchise tax assessments against plaintiff, defendant claims that only 80.478 per cent of the dividend paid in 1937 and 81.659 per cent of the dividend paid in 1938 were included in the measure of the tax imposed by the act on Ventura. Defendant obtains these percentages by dividing Ventura's net income for the year in question by its earnings and profits for the same period. The two figures differ because of the factors taken into account: thus, the oil depletion allowance which entered into the computation of Ventura's net income was a statutory percentage deduction but such item did not affect Ventura's schedule of earnings and profits since depletion sustained on a cost basis had already been recovered in previous years; and disbursements such as those made for federal income tax and franchise tax charges, which reduced the amount of Ventura's earnings and profits, did not affect the net income computation because not deductible under the act. (§ 8(c).) So— according to defendant—Ventura's net income of $775,282.65 divided by its earnings and profits of $963,338.63 gives the percentage of 80.478, which multiplied by plaintiff's dividend of $76,195 represents the proper dividend deduction to be allowed plaintiff for 1937; and Ventura's net income of $908,171.54 divided by its earnings and profits of $1,112,147.82 gives the percentage of 81.659, which multiplied by plaintiff's

dividend of $83,545 represents the proper dividend deduction to be allowed plaintiff for 1938.

Since plaintiff contends that the entire Ventura dividend received in 1937 and 1938 was deductible for franchise tax purposes in its respective returns as having been declared by Ventura from income "included in the measure of the tax" imposed by the act on Ventura, it is necessary to construe the language of the act to determine plaintiff's liability for the additional taxes assessed and collected by defendant under the above formula.

Section 4(3) requires that every corporation doing business within this state and not expressly exempted from taxation by the Constitution shall annually pay, for the privilege of exercising its corporate franchise, "a tax according to or measured by its net income, to be computed . . . at the rate of four per centum upon the basis of its net income for the next preceding fiscal or calendar year."

Section 7 defines "net income" as "gross income less the deductions allowed." Section 8 enumerates the allowable deductions. Among the items so listed is the dividend deduction under subdivision (h), the premise of the parties'° dispute. Applicable to plaintiff's 1938 return is the provision for the deduction in the subdivision as amended in 1937 (Stats. 1937, p. 2328) : "Dividends received during the income year from a bank or corporation doing business in this state declared from *income which has been included in the measure of the tax* imposed by this act upon the bank or corporation declaring the dividends." (Italics ours.) Applicable to plaintiff's 1939 return is the provision for the deduction in the subdivision as amended in 1939 (Stats. 1939, p. 2942) : "Dividends received during the income year declared from *income which has been included in the measure of the tax* imposed by this act upon the bank or corporation declaring the dividends, or from income which has been taxed under the provisions of the Corporation Income Tax Act of 1937 to the corporation declaring the dividends." (Italics ours.)

The import of the above italicized language carried into the respective amendments of section 8(h) here applicable is the pivotal point in controversy. Defendant's arguments rest on these steps: (1) That under fundamental principles of tax law as well as by statutory provision in the act itself since 1939, dividends are defined to be "any distribution made

by a corporation to its shareholders . . . out of its earnings or profits" (Stats. 1939, p. 2936, § 6(c) (1); 33 C.J. 303, § 78; Title 26, U.S.C.A., Internal Rev. Code, § 115); (2) that the "earnings or profits" of a corporation are generally not the same figure as its taxable net income because affected by different considerations—the former by the corporation's actual expenditures, the latter by the allowable statutory deductions; (3) that since the source of dividends is "earnings or profits," the word "income" as used in the allowable deduction of "dividends . . . declared from *income* which has been included in the measure of the tax" means "earnings or profits"; and so (4) where "earnings or profits" exceed "net income," then "it follows as a mathematical certainty that dividends declared from such earnings or profits are declared from earnings or profits which in part have not been included in the measure of the tax and the dividends are not fully deductible." Plaintiff does not dispute steps (1) and (2) of defendant's argument, but it does challenge their relevancy to the problem at hand and the logic of the concluding steps (3) and (4) in limiting the phrase "income which has been included in the measure of the tax" to mean no more than statutory net income. Rather, so plaintiff contends, the quoted phrase refers to "gross income subject to taxation by the state"; and since that item would include "earnings and profits" attributable to California sources, dividends paid therefrom would be "declared from income which has been included in the measure of the tax." A reasonable construction of the disputed language in relation to the basic concept of the act sustains plaintiff's position.

The tax in question is not one on income as such but one which the corporation must pay "for the privilege of exercising its corporate franchises within this state" (*Matson Navigation Co.* v. *State Board of Equalization,* 3 Cal.2d 1, 11 [43 P.2d 805]) and "according to or measured by its net income." (§ 4(3).) As the nature of the tax is distinguished, so is its basis of calculation. Thus, the act uses the term "net income" to specify the sum which, when multiplied by the prescribed percentage rate, determines the amount of the franchise tax. In this sense "net income," as defined by the act, is the final measure by which the tax is computed. (*San Joaquin Ginning Co.* v. *McColgan,* 20 Cal.2d 254, 256 [125 P.2d 36].) Since "net income" means "gross income less the deductions allowed" (§ 7), these factors necessarily enter

into the computation and are included in the measure of the tax. The income involved is *all* income, including earnings and profits, attributable to California sources; the deductions, including the prescribed depletion rate of 27½ per cent of gross income from oil and gas properties, are additional considerations. Following these principles, any dividend paid from "earnings and profits"—an item of gross income entering, like the authorized deductions, into the determination of net income—would be a dividend paid out of income included in the measure of the tax. As such the dividend is exempt from franchise tax in the hands of the recipient corporation.

This same conclusion was reached in the case of *Burton E. Green Investment Co.* v. *McColgan*, 60 Cal.App.2d 224 [140 P.2d 451], with regard to a practically identical factual situation involving the application of section 8(h) in its 1937 form. There the plaintiff taxpayer owned stock in Belridge Oil Company, a California corporation which during the year in question, 1937, derived all but a small portion of its income from the production and sale of oil and gas in this state. In its franchise tax return covering that year, Belridge Oil Company reported *all* its income and claimed the oil depletion allowance under section 8(g), which percentage depletion exceeded its actual cost depletion by a substantial amount. During 1937 Belridge Oil Company had paid to plaintiff certain dividends which plaintiff, in its appropriate franchise tax return, included in its gross income and then deducted under authority of section 8(h). In asserting an additional assessment against plaintiff, defendant tax commissioner took the position that "because the 27½ per cent of the gross income from the oil wells operated by Belridge exceeded the depletion deduction based upon actual cost, the excess of the deduction allowed over actual cost depletion is not a part of income which had been included in the measure of the tax imposed, within the meaning of section 8(h)." (60 Cal.App.2d 230-231.) In rejecting this theory, the court said at pages 231-232: "If the total Belridge income for 1937 was included in its gross income for franchise tax purposes and if out of its earnings of 1937 that corporation paid the dividend in question to plaintiff out of profits earned in that year, it must follow that the entire dividend so paid to plaintiff was declared from income which had been included in the measure of the tax. If it was, then it was deductible in

full. The very purpose of section 8 subdivision (h) is to avoid double taxation and thereby prevent the destruction of capital assets. While it aims to tax all income received as dividends (except those exempted by law) which have not been taxed while in the treasury of the dividend payor, at the same time it purposes to avoid the inclusion of the same income in the measure of the tax to be paid by two or more different taxpayers. If the same dividend is included in the measure of the tax paid by two taxpayers successively under the Franchise Tax Act, the result is multiple taxation."

Defendant attacks the pertinency of the Green Investment Company case because "it failed to take into consideration whether the earnings or profits of the declaring corporation out of which the dividends were declared were greater than the net income by which the tax on the declaring corporation had been measured." But such claim mistakenly assumes the relationship between "earnings and profits" and "statutory net income" to be a distinctive and controlling factor. In fact, this ratio involves no different considerations than were before the court in the Green Investment Company case. It simply rests on the theory that to the extent Ventura's dividends were declared from "earnings and profits" which exceeded in amount its "net income"—a difference wholly attributable to Ventura's taking of the oil and gas statutory depletion allowance—such dividends were paid from an untaxed source, and so from income not "included in the measure of the tax." In the Green Investment Company case the same point was considered as presented with relation to the extent the statutory percentage depletion exceeded the cost depletion and the consequent argument that "a portion of the Belridge dividend was paid from an untaxed source." In declaring this argument to be based upon a fallacious concept, the court aptly said at page 235: "Whether the amount of net income for the purpose of computing the franchise tax is increased or decreased by any adjustment which does not at the same time proportionately enlarge or diminish profits, it will not affect either the declaration of a dividend or the amount thereof. . . . Since . . . all of the Belridge income [including earnings and profits] was reported as gross income, all of its dividends were from a fund which had been flailed by the tax master," and therefore from "income which has been included in the measure of the tax."

The design of the act clearly contemplates the oil and gas percentage depletion (§ 8(g)) and the dividend deduction (§ 8(h)) as independent allowances to be taken by two separate corporations in the computation of their respective net incomes. Defendant attacks the propriety of a "percentage depletion [which] can go on and on after cost . . . has been completely recovered" by the oil operating company, but that is not a matter to be considered here. The procedure which defendant challenges is authorized by the act. Upon such premise it would appear that if the percentage depletion is properly deducted from gross income by the dividend declaring company in computing its net income for franchise tax purposes, it should not thereafter be assessed to the recipient corporation in the latter's computation. Rather, as the court succinctly stated in the Green Investment Company case at page 234, "the recipient is authorized to deduct the dividend which has passed through the tax mill before its distribution by the declaring corporation."

A consideration of the legislative history of section 8(h) lends additional force to plaintiff's position. As first enacted in 1929 (Stats. 1929, p. 23), section 8(h) provided for the deductibility of dividends "received during the taxable year from income arising out of business done in this state." This was construed to mean that it did not require dividends to arise out of business done in this state by the corporation which declared the dividends. Consequently, the deduction could be taken where the corporation paying the dividend was a foreign corporation and did no business in the state but merely owned stock in corporations operating in California from which it received income. (*Corporation of America* v. *Johnson*, 7 Cal.2d 295, 299-300 [60 P.2d 417].) To correct this situation, section 8(h) was amended in 1933 (Stats. 1933, pp. 688-689) by adding the requirement that the declaring corporation must have done business in this state. At the same time there was inserted the further requirement that the declaring corporation must have been constitutionally taxable in this state. But the base of the deduction was still whether the dividend was declared from income "arising out of business done in this state." Under such statutory test, it is apparent that the propriety of plaintiff's claim to the full Ventura dividend deduction taken on its respective franchise tax returns could not be questioned.

Then in 1937 section 8(h) was amended to include the language in question. In making the change the words "aris-

ing out of business done in this state'' were deleted and the deduction of dividends was allowed when declared from income ''which has been included in the measure of the tax imposed by this act.'' This new wording is significant in that coincident with its adoption the following provisions were eliminated from subdivision (h) as it read in 1933 : (1) The allocation allowance applicable where dividends were declared from income ''derived from business done within and without this state''; and (2) the reference to the inapplicability of the deduction to dividends paid by constitutionally tax exempt corporations. With its attention so focused on the eliminated provisions, the Legislature in the 1937 amendment apparently considered them unnecessary in view of the new wording, briefer in form, as expressive of the purpose of the deduction to avoid double taxation. Thus the language ''income which has been included in the measure of the tax'' appears to have a definite connection with the problem of allocating income within and without the state; and appears to refer to income attributable to California sources. Such view of the 1937 amendment coincides with the original purpose of the dividend deduction and with the natural import of the words. (Cf. *Burton E. Green Investment Co.* v. *McColgan, supra,* 60 Cal.App.2d 232-233.) The substituted language furnishes no basis for assuming that it was intended thereby to establish a new scheme of tax deduction dependent upon a ratio between ''earnings or profits'' and ''net income''—a view which would require, as defendant concedes, the interpretation of the word ''income'' in the disputed phrase to mean ''earnings or profits.'' Such interpretation not only creates a redundancy in that the word ''dividend'' itself implies a distribution from ''earnings or profits,'' but it also does violence to a cardinal principle of statutory construction in assigning a forced and strained meaning to a word contrary to its common understanding. (*Corbett* v. *Chambers,* 109 Cal. 178, 180 [41 P. 873] ; *In re Alpine,* 203 Cal. 731, 737 [265 P. 947, 58 A.L.R. 1500] ; *County of Los Angeles* v. *Frisbie,* 19 Cal.2d 634, 642 [122 P.2d 526] ; 23 Cal.Jur. 749, § 124.) Under such circumstances it is but reasonable to conclude that had the Legislature intended to restrict the dividend deduction solely to taxable net income, rather than to correlate it simply with income attributable to California sources, language expressive of such material change of purpose would have been adopted.

Additional proof of the legislative intention is found in section 9(d) which was also enacted in 1937 (Stats. 1937, pp. 2329-2330) when the phrase "included in the measure of the tax" first appeared in section 8(h). Thus, in computing net income, section 9(d) allowed no deduction for "any amount otherwise allowable as a deduction which is allocable to one or more classes of income not included in the measure of the tax imposed by this act." In so referring to income which is excluded from the computation of the franchise tax, the Legislature must have intended it in the sense of "gross income," since deductions are not allocable to "net income," which can only result *after* the appropriate deductions have been. taken. Speaking to this point, the court in the Green Investment Company case, *supra,* said at page 233: "In view of the use of the word income in section 9 subdivision (d) in the sense of gross income we are convinced that it has the same significance in section 8 subdivision (h). The Legislature could not have intended to use a significant word in two different senses in the same statute (*Ransome-Crummey Company* v. *Woodhams,* 29 Cal.App. 356 [156 P. 62]; *Coleman* v. *Oakland,* 110 Cal.App. 715 [295 P. 59].)"

▇ Nor does a contrary purpose appear from the 1939 amendment of section 8(h) by the addition of language allowing the deduction where the dividends were declared "from income which has been taxed under the provisions of the Corporation Income Tax Act of 1937 to the corporation declaring the dividends." The Corporation Income Tax Act (Stats. 1937, p. 2184, as amended; Deering's Gen. Laws, 1937, Act 8494a) supplements the Franchise Tax Act and is complementary thereto. (*West Publishing Co.* v. *McColgan,* 27 Cal.2d 705, 708 [166 P.2d 861].) Manifestly, the purpose of the 1939 amendment in the application of the dividend deduction was to place corporate stockholders of corporations taxable under the Corporation Income Tax Act on an equal basis with corporate stockholders of corporations taxable under the Franchise Tax Act. Accordingly, the phrase "income which has been included in the measure of the tax" for franchise tax purposes and "income which has been taxed under the provisions of the Corporation Income Tax Act" should be given consistent interpretation. Defendant argues that this is not possible unless the phrase in each case refers to "net income." The subject of the tax under the Corporation Income Tax Act is net income; under the Franchise Tax

Act, as previously noted, the subject of the tax is the privilege of exercising corporate franchises within this state, and the final measure thereof is "net income." The rate of tax is the same in both cases, 4 per cent of net income. But notwithstanding this distinction in the nature of the tax, once the taxpayer reports his gross income from California sources, whether for purposes of computation under the Franchise Tax Act or the Corporation Income Tax Act, all of that income "has passed through the tax mill"—has, so to speak, been taxed. Under such circumstances the 1939 amendment does not deflect from the propriety of construing the word "income" as used in the correlated references to mean "gross income."

Moreover, in considering these successive amendments the force of the decision in the Green Investment Company case cannot be overlooked. The court there said: "Since the gross income and specified deductions are the factors included in arriving at the net income, the conclusion is unavoidable that it is gross income that is included in the measure of the tax." (60 Cal.App.2d 233.) That case was decided in August, 1943. Since that time the Legislature has met on three occasions: at special sessions in 1944 and 1946, and at its regular biennial session in 1945, yet it has not amended section 8(h) of the act to avoid the result of that decision. Notable at the 1945 session is its readoption of section 8(h) without the slightest change in the language construed in the Green Investment Company case. (Stats. 1945, p. 1791.) Such readoption of a statutory provision amounts to ratification of the court's construction thereof. Speaking to this point, the court said in *Union Oil Associates* v. *Johnson,* 2 Cal.2d 727, at pages 734-735 [43 P.2d 291, 98 A.L.R. 1499]: "It is a cardinal principle of statutory construction that where legislation is framed in the language of an earlier enactment on the same or an analogous subject, which has been judicially construed, there is a very strong presumption of intent to adopt the construction as well as the language of the prior enactment." (See, also, *Guardianship of Reynolds,* 60 Cal. App.2d 669, 675 [141 P.2d 498]; *Hecht* v. *Malley,* 265 U.S. 144, 153 [44 S.Ct. 462, 68 L.Ed. 949]; *Carroll Electric Co.* v. *Snelling,* 62 F.2d 413, 416.)

But of even greater significance in this connection is the Legislature's direct refusal at the 1945 session to adopt an amendment to section 8(h) designed to overcome the effect

of the decision in the Green Investment Company case. Assembly Bill No. 912, introduced at that session for the purpose of amending various sections of the act in question, referred, among others, to section 8(h). After restating in subdivision (1) of that subsection the language of section 8(h) as amended in 1939, *supra,* said Assembly Bill 912 significantly proposed the following addition: ''(2) The portion of the dividend deductible under subdivision (1) of Section 8(h) shall be determined by ascertaining the ratio which the net income of the corporation declaring the dividend bears to the earnings and profits of such corporation for the same income year.'' Assembly Bill No. 913, introduced at the same session for the purpose of amending various sections of the Corporation Income Tax Act, contained the same proposal with reference to section 7(h) of that act, so that the correlation in operation between that Act and the Franchise Tax Act would continue. It is obvious that the proposed addition in the pertinent sections of the two acts provided for the dividend deduction to be determined exactly in the manner in which defendant seeks to have it computed here in the absence of such provision. However, the Senate, upon recommendation of its Committee on Revenue and Taxation, amended both Assembly bills and the proposed addition was stricken in each case. (Senate Journal, Fifty-Sixth Session, p. 2635.) In such form both bills were ultimately passed: Assembly Bill No. 912 became chapter 946 of the 1945 laws (Stats. 1945, p. 1779) and Assembly Bill No. 913 became chapter 859 of the 1945 laws (Stats. 1945, p. 1572). Such action of the Legislature forcefully demonstrates that it appreciated that a substantial change in the wording of section 8(h) would be required to effect a different basis for allowance of the dividend deduction as previously provided and construed; and that it decided to adhere to the premise of the Green Investment Company case in the construction of said section.

For these reasons we conclude that plaintiff was entitled to deduct the Ventura dividend in full on its respective franchise tax returns covering its 1937 and 1938 income.

The judgments are, and each of them is, affirmed.

Shenk, J., Edmonds, J., and Schauer, J., concurred.

TRAYNOR, J.—I dissent.

The allowance of the deduction in section 8(h) of the Bank and Corporation Franchise Tax Act is designed solely to pre-

vent double taxation of corporate income by this state. This section was drafted to cover dividends generally; it was not aimed particularly at dividends declared out of earnings or profits not included in the measure of the tax because of the percentage depletion deduction. Dividends out of earnings or profits not included in the measure of the tax on the dividend-declaring corporation because of the percentage depletion deduction are on the same footing as any other dividends out of earnings or profits not included in the measure of the tax on such corporation. Earnings or profits may be excluded from the measure of the tax for a variety of reasons other than the percentage depletion deduction. They may represent income earned by the dividend-declaring corporation from business outside of this state; they may have been accumulated before the effective date of the act; they may have been declared by a corporation not taxable under the Bank and Corporation Franchise Tax Act. Whatever the reason earnings or profits of the dividend-declaring corporation are not included in the measure of the tax on such corporation, a recipient corporation cannot deduct dividends declared out of such earnings or profits, for the deduction is expressly limited to dividends declared out of income that was included in the measure of the tax.

If all of the net income of a corporation is derived from business in California, and all of its earnings or profits are included in the measure of the tax, all dividends declared out of such earnings or profits will be deductible by the recipient corporations. The same income would be taxed twice if it were included in the measure of the tax on the dividend-declaring corporation and included again in the measure of the tax on the recipient corporations. If none of the income of the dividend-declaring corporation is included in the measure of the tax on such corporation, none of its dividends will be deductible by the recipient corporations. Thus the dividend-declaring corporation may be a foreign corporation that does no business in California and is not subject to the act; it may be a Federal Reserve Bank not subject to state taxation; it may be an insurance company not subject to taxation on or measured by net income; it may have earned the income in question before the effective date of the Bank and Corporation Franchise Tax Act.

The income of the dividend-declaring corporation may be derived in part from business carried on outside the state.

Income from out of state business is not included in the measure of the tax and consequently dividends representing such income are not deductible by the recipient corporations.

The deduction is allowed only when the earnings or profits out of which the dividends are declared have been included in the measure of the tax on the corporation declaring the dividends. For example: X Corporation, which derives all its income from business done in this state, declares a dividend from its earnings or profits to Y, a foreign corporation not subject to the act, which in turn, out of the money received declares a dividend to Z, which is taxable under the act. Since the earnings or profits from which the dividend was declared by Y was not included in the measure of a tax under the Act on Y, the dividend is not deductible by Z. Even if Y did business in California, and was therefore taxable under the act, Z could not deduct the dividend, since the earnings or profits from which the dividend was declared would not be included in the measure of the tax on Y because the dividend would be deductible by Y under section 8(h).

A dividend may be declared by a foreign corporation that operates an oil well outside this state and does no business here. It may have no net income for purposes of taxation, and yet have earnings or profits for dividend purposes. A California corporation receiving such a dividend could not deduct the amount thereof under section 8(h), for the earnings or profits out of which it was declared were not included in the measure of the tax by this state on the dividend-declaring corporation. The result would be no different if the dividend-declaring corporation were a California corporation operating its oil well in this state. Since it would have no net income under the act, it would pay the minimum tax of $25. Yet it would have earnings or profits from which to declare dividends to its shareholders. Such dividends would not be deductible for the reason that prevails in all cases in which dividends are not deductible, namely, the earnings or profits out of which the dividends are declared would not be included in the measure of the tax on the dividend-declaring corporation.

In the foregoing example, the dividend-declaring corporation had no net income. The principle that the deduction is allowed only to the extent necessary to prevent double taxation by this state is equally applicable when the dividend-

declaring corporation has net income. Thus a California oil company after deducting percentage depletion, may have net income for tax purposes of $500,000 but earnings or profits of $1,000,000 for dividend distributions. If the earnings or profits are distributed as a dividend to a California corporation, only one-half of the dividend will be deductible, since the measure of the tax on the dividend-declaring corporation will include only one-half of the earnings or profits out of which the dividend is declared.

In the present cases, the earnings or profits from which the dividends were declared likewise exceeded the net income by which the tax on the dividend-declaring corporation was measured, and there has obviously been no tax measured by such excess. To the extent they represent such excess, dividends cannot be deducted without defeating the purpose of section 8(h) to limit the deduction to the extent necessary to prevent double taxation.

Not only the purpose of section 8(h) but its express provisions preclude a deduction in their entirety of the dividends in question. Section 8(h) as amended in 1937 provides: "Section 8: In computing 'net income' the following deductions shall be allowed: . . . (h) Dividends received during the income year from a bank or corporation doing business in this State declared from income which has been included in the measure of the tax imposed by this Act upon the bank or corporation declaring the dividend." In 1939 the Legislature added the following to section 8(h) : "or from income which has been taxed under the provisions of the Corporation Income Tax Act of 1937[1] to the corporation declaring the dividends."

The purpose of this provision can be grasped only if its terms are understood. The "measure of the tax imposed by this Act" is net income. (§§ 1, 2, 4.) "Net income" is defined in section 7 of the act to mean "gross income" as defined in section 6, less the deductions provided for in section 8. "Dividends" mean "any distribution made by a corporation to its shareholders . . . out of its earnings or profits. . . ."[2]

---

[1] The Corporation Income Tax Act supplements the Bank and Corporation Franchise Tax Act and imposes a tax on the net income of certain corporations not subject to the latter act. (See *West Publishing Co.* v. *McColgan*, 27 Cal.2d 705, 708 [166 P.2d 861].)

[2] This definition was added in 1939. The Franchise Tax Commissioner, following the federal income tax law on which the state act is based, ascribed the same meaning to the term "dividend" in the administration of the act before this definition was added.

(§ 6(c) (1).) "Earnings or profits," generally speaking, mean gross receipts less the expense of producing them. (Weyerhaeuser, 33 B.T.A. 594, 597; Ayer, 12 B.T.A. 284, 287.) Since dividends are declared, not from statutory gross income or statutory net income, but from earnings or profits, and only from earnings or profits, the word "income" in the phrase "Dividends . . . declared from income . . ." necessarily means earnings or profits.

Since net income (statutory gross income less statutory deductions) and earnings or profits (gross receipts less the expense of producing them) are computed differently, they will usually not be the same. If the earnings or profits exceed net income, it follows as a mathematical certainty that part of the earnings or profits have not been included in the measure of the tax and that the dividends declared out of such earnings or profits are not fully deductible.

The following illustrations, cited by defendant, show the difference between net income and earnings or profits and demonstrate that dividends may be declared from earnings or profits that have not been included in the measure of the tax. A domestic corporation, engaged in activities solely within this state, receives gross income of $100,000 and pays salaries amounting to $40,000, rent amounting to $25,000 and federal income taxes amounting to $15,000. For purposes of computing earnings or profits all of these items are taken into consideration, but for purposes of computing net income, federal income taxes are not, since they are not deductible under the act. Thus we have the following comparison:

| *Earnings or Profits* | | | *Net Income* | | |
|---|---|---|---|---|---|
| Gross | | | Gross | | |
| Income | | $100,000 | Income | | $100,000 |
| Minus | | | Minus | | |
| Salaries | $40,000 | | Salaries | $40,000 | |
| Rent | 25,000 | | Rent | 25,000 | 65,000 |
| Federal | | | | | |
| Income | | | | | |
| Taxes | 15,000 | 80,000 | | | |
| Earnings | | | | | |
| or profits | | $20,000 | | | $35,000 |

In the foregoing illustration, the statutory net income is greater than the earnings or profits because federal income taxes are not deductible in computing net income. Since the

net income includes all the earnings and profits (it even exceeds them), any dividends declared out of such earnings or profits will represent income included in the measure of the tax, and will therefore be fully deductible. The reverse may be true. Suppose the same facts as above except that the corporation engages in activities both within and without the state and that under an appropriate allocation formula only 30 per cent of its net income is attributable to this state. The comparison would then be:

| Earnings or profits | $20,000 | Total Net Income | $35,000 |
|---|---|---|---|
| | | Net income attributable to California | 30% |
| | | | $10,500 |

In the foregoing illustration the earnings or profits are greater than the net income by which the tax is measured because net income not attributable to California is excluded from the measure of the tax. Dividends declared out of earnings or profits representing such income will therefore not be deductible.

Similarly, dividends declared out of earnings or profits excluded from the measure of the tax by virtue of the deduction for percentage depletion are not deductible. It makes no difference whether percentage depletion is allowed as an exemption, an exclusion from gross income, or as a deduction from gross income. Income representing the allowance for depletion is as effectively excluded from the measure of the tax by way of deduction as it would be by way of an exemption or exclusion from gross income. The figure that is left after the deductions are taken is net income. That part of the gross income accounted for by deductions cannot possibly be included in net income, for the deductions exclude the amount thereof from the net income. Most of the deductions will represent outlays made in earning the gross income, and since such outlays cannot be the source of dividends, no problem with respect thereto can arise under section 8(h). The problem presented in the instant cases can arise only when the item deducted is itself income that is part of the corporation's earnings and profits. When the deduction for depletion represents a return of the corporation's capital, any dividend distribution represented by the amount of such deduction would be a return of capital to the shareholders and

would lower the basis of the stock for computing gain or loss. If the depletion allowance does not represent a return of capital it can only represent earnings and profits (See Rudick, *"Dividends" and "Earnings or Profits" Under The Income Tax Law,* 89 U. of Pa. L.Rev., 865, 866; 1 Mertens' Law of Federal Income Taxation, 472; Ayer, 12 B.T.A. 284; Treas. Reg. 111, § 29.115-3.) that are not included in the measure of the tax. Since such earnings and profits are not included in the corporation's net income and therefore not included in the measure of the tax, dividends declared therefrom do not meet the requirements of section 8(h) as dividends "declared from income which has been included in the measure of the tax."

Suppose a domestic corporation is engaged in activities solely within this state. Suppose further that it receives gross income in the amount of $130,000, including royalties from oil and gas wells in the amount of $100,000, and that the corporation pays salaries of $40,000, and that it does not have any cost depletion but takes a deduction for depletion equal to 27½ per cent of the $100,000, or $27,500. The comparative computations would then be:

| *Earnings or Profits* | | | *Net Income* | | |
|---|---|---|---|---|---|
| Gross | | | Gross | | |
| Income | | $130,000 | Income | | $130,000 |
| Minus | | | Minus | | |
| Salaries | $40,000 | | Salaries | $40,000 | |
| Rent | 25,000 | | Rent | 25,000 | |
| Federal | | | Percentage | | |
| Income | | | Depletion | 27,500 | 92,500 |
| Taxes | 15,000 | 80,000 | | | |
| Earnings | | | | | |
| or profits | | $50,000 | Net Income | | $37,500 |

In this illustration nothing is subtracted for depletion in computing earnings or profits because there was no depletion cost, and nothing is subtracted for federal income taxes in computing net income because the act does not provide for a deduction for federal income taxes. On the other hand, federal income taxes are subtracted in computing earnings or profits because they are an expense, and percentage depletion is deducted in computing net income because the act provides for such a deduction. In this illustration the earnings or profits exceed the net income by $12,500, and it is mathematically impossible for such excess to be included in the net in-

come. Consequently, dividends cannot be deducted to the extent they are declared out of such excess.

In the present cases, the "net income" of the Ventura Land and Water Company (hereinafter called "Ventura") for tax purposes for the year 1937 was $775,282.65. It was stipulated that the earnings or profits of Ventura for that year were $963,338.63. The two figures differ for the following reasons: The "earnings or profits" were not reduced on account of cost of depletion because there was none, but in computing "net income," $328,836.47 was deductible as percentage depletion, because this deduction was provided for by statute. On the other hand, Ventura had outlays of $110,372.58 for federal income taxes, $30,157.90 for California franchise tax and $250 as non-deductible contributions, all of which served to reduce Ventura's "earnings or profits," because they constituted expenses, but none of which was deductible in computing "net income" for franchise tax purposes, because the act does not provide for such deductions. Thus, although Ventura's "net income" for franchise tax purposes for the income year 1937 was $775,282.65, its "earnings or profits" (the fund available for distribution of dividends) for that year amounted to $963,338.63, or $188,055.98 more than its net income. The excess for 1938 was $203,976.28.

As in the preceding example, it is mathematically impossible for the earnings or profits in excess of the net income to be included in the net income. Consequently, at least to the extent the dividends represent such excess, they are not deductible.

Plaintiff contends, and the majority opinion sustains the contention, that the phrase "income which has been included in the measure of the tax" refers to "gross income subject to taxation by the state" and since that item would include earnings and profits attributable to California sources, dividends paid therefrom would be "declared from income which has been included in the measure of the tax."

The Bank and Corporation Franchise Tax Act imposes a tax "according to or measured by net income." (§§ 1, 2, 4.) How could the Legislature state in plainer terms that "net income" is the measure of the tax? In the light of this language how can it be seriously contended that the measure of the tax is "gross income subject to taxation by the state?" Plaintiff confuses the measure of the tax with its computation. It is true that gross income is a necessary factor in computing net

income. So are the deductions allowed, but that does not make them the measure of the tax. Any gross income that remains after deductions are taken is included in the measure of the tax, but it is logically and mathematically impossible for any gross income that is represented by such deductions to be included therein. In concrete figures, plaintiff's contention amounts to saying that if a corporation has gross income of $100,000 and is allowed deductions of $50,000, leaving a net income of $50,000, then the whole $100,000 has been included in the net of $50,000.

Any possible doubt that section 8(h) requires the source of the dividend to be included in the net income of the dividend declaring corporation has been dispelled by the 1939 amendment adding the phrase ''or from income which has been taxed under the provisions of the Corporation Income Tax Act of 1937 to the corporation declaring the dividends.'' The purpose of this amendment is to place corporate shareholders of corporations taxable under the Corporation Income Tax Act on an equal footing with corporate shareholders of corporations taxable under the Bank and Corporation Franchise Tax Act. The two acts are complementary. (See *West Publishing Co.* v. *McColgan,* 27 Cal.2d 705, 708 [166 P.2d 861].) The rate of tax is the same and the provisions for the two acts are correlated. The essential difference between them is that in the former the subject of the tax is net income, in the latter the subject of the tax is the privilege of doing business in this state in corporate form, and net income is the measure of the tax. Since the Corporation Income Tax Act is imposed directly on net income, the 1939 amendment does not use the phrase ''income included in the measure of the tax.'' Had the Legislature intended the phrase as used with respect to corporations subject to the Bank and Corporation Franchise Tax Act to mean gross income it would have provided in the 1939 amendment for the deduction of dividends declared from gross income rather than from income taxed under the Corporation Income Tax Act.

Assume for the purposes of argument that ''income'' as used in section 8(h) means ''gross income'' as plaintiff contends. Section 8(h) would then be construed as if it read, ''Dividends received during the income year declared from gross income which has been included in the measure of the tax.'' Even this construction would not support plaintiff's contention, for the section would still contain the qualifying

phrase, "which has been included in the measure of the tax" a phrase that recognizes unequivocally that not all "gross income" is included in the measure of the tax.

Only if all gross income is included in the measure of the tax can plaintiff's contention be sustained. In the foregoing discussion it has been demonstrated that when the earnings or profits out of which dividends have been declared exceed the statutory net income of the dividend-declaring corporation, it is mathematically impossible for all of the gross income to be included in the measure of the tax on such corporation. Confusing net income with the process of computing it, plaintiff contends that all gross income is included in the measure of the tax because it is "income which has been taken into account" or "income which has been through the tax mill" or "income which has been flailed by the tax master." This contention would render meaningless the limitation of the deduction to "dividends declared from income which has been included in the measure of the tax," for the gross income of all corporations taxable under the act is "taken into account" or goes "through the tax mill" or is "flailed by the tax master." Accordingly, dividends declared by such corporations would be deductible in their entirety. Thus the entire gross income of a corporation doing business within and without this state is "taken into account" in computing its tax. The corporation is required to report its gross income from all sources, both within and without the state, and the net income that is arrived at after taking the statutory deductions is allocated part to this state and the remainder to the other states, usually by means of a formula. (*Butler Bros.* v. *McColgan*, 17 Cal.2d 664 [111 P.2d 334]; 315 U.S. 501 [62 S.Ct. 701, 86 L.Ed. 991].) Thus, for purposes of illustration, suppose a corporation that does business in California and in other states has a total gross income from all its business for a particular year of $1,000,000, earnings or profits of $800,000, and net income of $600,000, of which $60,000 is attributable to California. If the corporation then pays out the entire $800,000 of earnings or profits as dividends to California corporations whose only activities were in this state, the view that all amounts that have been taken into account as "gross income" have thereby been included in the measure of the tax would mean that the California corporations receiving these dividends amounting to $800,000 could deduct them in their entirety although the corporation declaring the dividends had only paid a tax

measured by $60,000. Certainly no such result is necessary to avoid double taxation by this state, and plaintiff concedes that such dividends would not be fully deductible. Yet such dividends meet the conditions urged by plaintiff for the deduction of the dividends in question, for all the gross income of the dividend-declaring corporation was "taken into account," "went through the tax mill" and was "flailed by the tax master."

Plaintiff's suggestion that the disputed phrase in section 8(h) should be interpreted to mean "gross income attributable to California sources" is not only administratively unworkable but is inconsistent with the basic structure of the act. With respect to a corporation doing business within and without the state, the act provides, not for the ascertainment of the gross income attributable to this state, but for the ascertainment of the net income attributable to this state. Such a corporation is required to report its gross income from all sources within and without the state; all applicable deductions are taken, and the total net income is determined. Part of this total is then allocated to this state. Ordinarily, in the cases of businesses conducted within and without the state there is no feasible way of determining what part of the gross income or of the deductions is attributable to this state. Consequently, the act provides for a determination of the amount of net income earned by the business as a whole and then for an allocation of part of that income to this state.

It is contended that it is anomalous for the Legislature to allow oil companies a deduction for depletion that is more than sufficient for a recovery of costs and then in effect to nullify the tax savings derived by the dividend-declaring corporation from percentage depletion by denying their corporate shareholders a deduction for dividends out of earnings or profits represented by the depletion deduction. The extent to which income is taxed and the extent to which deductions are allowed is entirely a matter of legislative discretion so long as constitutional restrictions are observed. The Legislature has seen fit to allow a deduction for depletion in the terms prescribed. It has also seen fit to deny a deduction for dividends unless double taxation by this state would result. Whether it was wise for the Legislature to do either of these things is of no concern here. The Legislature has not chosen, as it could have, to require domestic corporations to include their entire net income, including income from out of state business, in the

measure of the tax. Yet it denies corporate shareholders of such corporations a deduction for dividends declared out of earnings or profits from out of state business, and the very reason it does so is that such earnings or profits are not included in the measure of the tax on the dividend-declaring corporation. There is no more reason to grant corporate shareholders of oil companies a deduction for dividends out of earnings or profits excluded from the measure of the tax on such companies by way of the deduction for percentage depletion than there would be to grant corporate shareholders of domestic corporations a deduction for dividends declared from earnings or profits excluded from the measure of the tax on such corporations because derived from out of state business. In each case the recipient corporations are denied the deduction because the tax savings allowed the dividend-declaring corporation preclude double taxation by this state.

Section 3 of the Corporation Income Tax Act provides: "provided, however, that the income of any corporation which is included in the measure of the tax imposed by the Bank and Corporation Franchise Tax Act, Statutes 1929 Chapter 13, as amended, shall not be subject to the tax imposed by this act. . . ." Plaintiff contends that if the Bank and Corporation Franchise Tax Act applies, the Corporation Income Tax Act does not apply and that since this is the clear meaning of section 3 it follows that the phrase "included in the measure of the tax" in section 3 of the Corporation Income Tax Act must mean gross income from California sources. The purpose of the Corporation Income Tax Act is to prevent discrimination against corporations subject to the Bank and Corporation Franchise Tax Act. Since the subject of the tax in the latter act is the privilege of exercising corporate franchises in this state, decisions of the United States Supreme Court prevent its application to foreign corporations engaged exclusively in interstate commerce. (See cases cited in *West Publishing Co.* v. *McColgan,* 27 Cal.2d 705, 708 [166 P.2d 861].) A tax on the net income of such corporations, however, is valid, and the Corporation Income Tax Act imposes such a tax. (Ibid. p. 709, *West Publishing Co.* v. *McColgan,* 328 U.S. 823 [66 S.Ct. 1378, 90 L.Ed 1603].) In order to avoid any suggestion of discrimination against interstate commerce the act was made applicable to the income of all corporations derived from sources within this state, including the income of corporations taxable under the Bank and Corporation

Franchise Tax Act. In order to prevent discrimination against corporations taxable under the latter act by the imposition of a double tax burden thereon, section 3 of the Corporation Income Tax Act was added to exempt the income included in the measure of the tax on such corporations. If that were the only exemption provision in the Corporation Income Tax Act, other income, such as income from out of state business, from dividends for which a deduction is allowed, and income represented by the depletion deduction would be taxable under the Corporation Income Tax Act. That act, however, contains other provisions identical with provisions of the Bank and Corporation Franchise Tax Act that allow a deduction for dividends (§ 7(h) and percentage depletion (§ 7(g) and that exclude income from out of state business. (§ 3, 13.) Thus the exemption of such income in the Corporation Income Tax Act arises because of specific provisions of that act and not from any theory that gross income is included in the measure of the Bank and Corporation Franchise Tax within the meaning of section 3 of the Corporation Income Tax Act.

A comprehensive tax statute such as the Bank and Corporation Franchise Tax Act exemplifies intricate draftsmanship; it evolves out of the painstaking deliberations and studies not only of public officials but of others interested in tax legislation. Such a statute, wrought from a consideration of many conflicting interests, cannot long retain unity and coherence if one section or another is refrabricated by the courts without regard for the structural whole. The technical concepts of the statute, its express provisions, should not lightly be vitiated by facile phrases such as ''gone through the tax mill'' or ''flailed by the taxmaster'' that denote a lack of insight into the legislative purpose that binds together the provisions of the statute. If the express words of the statute are overridden by such phrases neither taxpayers nor tax officials can look to the written word of the statute for its authentic meaning, and the already difficult task of understanding the revenue acts becomes hopeless.

The majority opinion relies heavily on the case of *Burton E. Green Investment Co.* v. *McColgan.* (60 Cal.App.2d 224 [140 P.2d 451], petition for hearing denied by this court.) That case unquestionably supports plaintiff's contentions, but in my opinion it was erroneously decided and should be disapproved. It is contended, however, that section 8(h) was not amended at the regular session or the two special sessions of

the Legislature after the decision in that case, that in 1945 a Senate committee rejected a proposed amendment providing that dividends were deductible only in the ratio of the dividend-declaring corporation's earnings or profits to its net income, and that therefore the Legislature adopted the court's construction of the act in the Green case. The opinion in the Green case, however, contains so many errors fundamentally at variance with many provisions of the act that the Legislature cannot reasonably be presumed to have adopted the construction of the act in that case. These errors will be briefly described.

(1) The court in the Green case states (60 Cal.App.2d 224, 231) that net income "does not constitute the 'measure of the tax.' The income included in the measure of the tax is all income." These statements repudiate the following express provisions of the act: "Every national banking association located within the limits of this State shall annually pay to the State a tax *according to or measured by its net income,* to be computed, in the manner hereinafter provided, upon the basis of its *net income* for the next preceding fiscal or calendar year. . . ." (§ 1; italics added.) "Every bank, other than a national banking association, located within the limits of this State, shall annually pay to the State, for the privilege of exercising its corporate franchises within this State, a tax *according to or measured by its net income,* to be computed, in the manner hereinafter provided, upon the basis of its *net income* for the next preceding fiscal or calendar year. . . ." (§ 2; italics added.) "Every financial corporation doing business within the limits of this State . . . shall annually pay to the State, for the privilege of exercising its corporate franchises within this State, a tax *according to or measured by its net income,* to be computed, in the manner hereinafter provided, upon the basis of its *net income.* . . ." (§ 4(1); Italics added.) "With the exception of financial corporations, every corporation doing business within the limits of this State . . . shall annually pay to the State, for the privilege of exercising its corporate franchises within this State, a tax *according to or measured by its net income,* to be computed in the manner hereinafter provided, . . . upon the basis of its *net income* for the next preceding fiscal or calendar year. . . ." (§ 4(3); italics added.) If the income included in the measure of the tax were all income, as the court in the Green case states it is,

the tax on national banks would be invalid under section 5219 of the United States Revised Statutes, for, while that section authorizes a tax on national banks according to or measured by their net income, it does not authorize a tax measured by all their income. Can it reasonably be contended that the Legislature adopted a construction that would not only repudiate express provisions of the act but invalidate the tax on national banks?

(2) The court in the Green case states (60 Cal.App.2d 224, 233) that proof of the legislative intention is to be found in section 9(d), which was also enacted in 1937. That section provides: "In computing net income no deduction shall be allowed for: . . . (d) Any amount otherwise allowable as a deduction which is allocable to one or more classes of income not included in the measure of the tax imposed by this act." The court states that the word "income" is used in section 9(d) in the sense of "gross income" and that the word "income" in section 8(h) must have been used in the same sense. Why must it? The two sections serve different purposes and there is no necessary relation between them. Assume, however, for the purpose of argument, that the word "income" means "gross income" in both sections. The court also states (60 Cal.App.2d 224, 231) that all income is included in the measure of the tax. Yet section 9(d) specifically refers to "classes of income which have not been included in the measure of the tax. . . ." If all income is included in the measure of the tax, as the court says it is, how can there be classes of income that have not been included in the measure of the tax? The court's reasoning renders section 9(d) meaningless, for, if, as the court says, all income is included in the measure of the tax, there would never be a case in which items of income had not been included in the measure of the tax, and hence, there never would be a case in which any amount was allocable to one or more classes of income not included in the measure of the tax.

In section 9(d) the Legislature was not concerned with the question whether the classes of income referred to were either "gross income" or "net income." There are several reasons why a class of income may not have been included in the measure of the tax: it may be a class of income that has been excluded from the statutory definition of gross income, e. g. amounts received under life insurance policies (§ 6(b)); it may be a class of income, which, although required to be re-

ported in gross income is fully deductible, such as income from business activities of certain types of corporations ( §§ 8(1) and 8(m) ; or it may be a class of income that is allocated to other states because it is derived from sources outside this state, e. g. income from intangibles having a situs outside the state. (§ 10.)

(3) The court in the Green case states (60 Cal.App.2d 224, 235) that "the Act makes no provision for computing depletion on the basis of cost." This statement is erroneous. Section 8(g) of the act as amended in 1937 incorporated by reference the provisions of section 113 and 114 of the federal Revenue Act of 1936. Since 1939 these provisions have been set forth in full in the California Act. Under these provisions, a deduction may be taken for either cost depletion or percentage depletion, whichever is greater. Hence, if cost depletion exceeds percentage depletion a deduction for cost depletion may be taken. Certainly, the Legislature did not adopt a construction of the act that repudiates so vital a provision.

(4) The court in the Green case erroneously assumed that percentage depletion represents an exhaustion of capital and that the dividends were fully deductible to prevent a tax on capital. The court states (60 Cal.App.2d 224, 234) that "Whatever method of computing depletion be followed . . . the purpose is to leave in the hands of the taxpayer unappropriated that portion of the cost attributable to the amount of capital exhausted in earning the income on which any variety of tax is to be paid. . . . In view of the extreme difficulty of devising a precise formula . . . it was obviously determined that depletion based on a percentage of the gross income from the mineral or oil deposit must closely approximate the actual physical exhaustion. . . . If it represents a positive exhaustion of capital it should be deducted by the owner of the property as a method of avoiding the exhaustion of capital. If it is properly deducted in computing the oil operator's income for dividend purposes it should not thereafter be charged to the recipient corporation in computing his income for franchise tax purposes. To avoid such a hardship the recipient is authorized to deduct the dividend. . . ."

The foregoing statement is in error on at least three counts : (a) Percentage depletion does not necessarily represent an exhaustion of capital. "Percentage depletion is not based on cost and in many cases taxpayers recover tax free by way of

percentage depletion far in excess of the cost of their oil properties. . . ." (*Estate of Japhet,* 3 Tax Court 86.) The percentage depletion deduction may continue, as here, after cost or capital invested has been completely recovered. Thus, in the present cases Ventura had deductions of $328,836.47 and $384,872.10 for percentage depletion in the two years here involved. It is stipulated that Ventura fully recovered its cost or capital in prior years. Therefore, there can be no question of "invasion of capital" since Ventura has completely recovered its capital investment in prior years. There also was no question of invasion of capital in the Green case.

(b) Percentage depletion in excess of cost depletion is not deductible in computing earnings or profits for dividend purposes. (Ayer, 12 B.T.A. 284; Wood, 3 T.C. 187; see, Rudick, *"Dividends" and "Earnings or Profits" under The Income Tax Law,* 89 U.ofPa.L.Rev., 865, 886; 1 Mertens, Law of Federal Income Taxation 472.) Plaintiff in the present cases recognized this and stipulated to the computations of "earnings or profits" for the years involved. These computations plainly show that percentage depletion in excess of cost depletion is not a deductible item in computing the fund available for dividends.

(c) If a corporate distribution is a "dividend" within the meaning of the act, then necessarily no element of capital can be present in the distribution. "Dividends" are specifically defined in the act (§ 6(1)) as distributions out of earnings or profits. In computing "earnings or profits" available for dividends, a deduction for cost depletion is always allowed as long as there is any cost to be recovered. Any distribution out of capital would not be a "dividend" because it would not be made out of earnings or profits. If a distribution is made out of capital it does not constitute a dividend and the recipient cannot claim a deduction for it under section 8(h), which permits a deduction only for dividends. A distribution out of capital reduces the basis for tax purposes of the stock held by recipients of the distribution, but cannot constitute a dividend. Since a dividend is defined as a distribution out of "earnings or profits," it follows that any corporate distribution that constitutes a dividend cannot represent an invasion of capital. The distributions in the Green case were admitted to be dividends. Hence the conclusion of the court that a deduction of the Belridge dividends was necessary to prevent a tax on capital was clearly in error.

(5) The court in the Green case erroneously stated (60 Cal.App.2d 224, 233), that the 1937 amendment to section 8(h) was not intended to alter its meaning as expressed in 1933. A comparison of the amended sections and a list of the changes effected will show the extent of the court's error. Section 8(h) as amended in 1933 (Stats. 1933 ch. 209) provided: "In computing 'net income' the following deductions shall be allowed: (h) Dividends received during the taxable year from a bank or corporation doing business in this State declared from income arising out of business done in this State: . . . The provisions of this subsection shall not apply to dividends received from corporations not taxable under article thirteen of the Constitution of this State. . . ." Section 8(h) as amended in 1937 provided: "Dividends received during the income year from a bank or corporation doing business in this State declared from income which has been included in the measure of the tax imposed by this act upon the bank or corporation declaring the dividends." The most obvious change made by the 1937 amendment was to restrict the deduction to dividends declared by corporations taxable under the act, as contrasted with the 1933 section, which permitted the deduction as long as the declarer corporation was doing business in the state and was subject to tax under article XIII of the Constitution. Thus, for example, dividends from insurance companies would be deductible under the 1933 act, but not under the 1937 act. Another obvious change was the restriction of the dividend deduction to distributions from income that had been included in the measure of the tax imposed upon the *corporation declaring the dividends*. The insertion of this restriction was prompted by the decision in *Corporation of America* v. *Johnson,* 7 Cal.2d 295 [60 P.2d 417], which interpreted the language "income arising out of business done in this State," which appeared in the 1929 version of section 8(h) as not restricted to income from business done by the corporation declaring the dividends. Since the same phrase "income arising out of business done in this State" was present in the 1933 provisions of section 8(h) presumably the rule of the Corporation of America case applied to it except as restricted by other conditions in the 1933 act.

The plaintiff seeks to dismiss these errors as "rhetorical imperfections." They cannot be dismissed so lightly, for they

were the very premises on which the court based its interpretation of the statute. This court's denial of a hearing in the Green case, does not constitute approval of the propositions of law laid down in the opinion of the District Court of Appeal. (*Western Lithograph Co.* v. *State Board of Equalization,* 11 Cal.2d 156, 167-168 [78 P.2d 731; 117 A.L.R. 838] ; *Bohn* v. *Bohn,* 164 Cal. 532, 537-538 [129 P. 981].)[1] In *Helvering* v. *Hallock,* 309 U.S. 106, 119 [60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368], the United States Supreme Court said that "It would require very persuasive circumstances enveloping congressional silence to debar this court from re-examining its own doctrines." In the present case not even the reexamination of this court's own doctrines is involved.

Rules of statutory construction are at best only aids in ascertaining the legislative purpose. One of those aids has here been seized upon, in disregard of the plain signposts within the statute and the basic concepts underlying it, to establish administratively unworkable conditions, accord unequal treatment to dividends, and open the way to a more extensive deduction than necessary to achieve the legislative purpose of avoiding double taxation.

*Girourard* v. *United States,* 328 U.S. 61 [66 S.Ct. 826, 90 L.Ed. 1084] directly involved the question whether failure to amend a statute after a judicial construction thereof constituted congressional adoption of that construction. The court said: "We conclude that the Schwimmer, Macintosh and Bland Cases do not state the correct rule of law. We

---

[1]In *Bohn* v. *Bohn, supra,* the court declared: "Our further examination of the case has led us to the conclusion that the Department opinion was correct. The principal reason for granting a hearing in Bank was that, in a case between the same parties, presenting precisely the same issues of fact and law, the district court of appeal for the second appellate district had reversed an order like the one here appealed from, and that a petition to have the appeal transferred to this court for hearing and determination had been denied. (*Bohn* v. *Bohn,* 16 Cal.App. 179 [116 P. 568].) It is, of course, much to be regretted that opposite rulings should be made in two cases which present identical questions. But an order of this court, refusing to transfer a cause after judgment in the district court of appeal, does not adopt the opinion of the appellate court so as to give it, in this court, the authoritative effect which one of our own decisions would have. Being now convinced that the order appealed from should be affirmed, we must so declare, even though this view necessarily involves the conclusion that the earlier appeal should have been transferred to this court, and thereupon disposed of by a judgment differing from that rendered in the district court of appeal. Indeed, believing, as we do, that the order now under review was properly made, it would be our duty to affirm it, even if this court had itself, in another case, reversed an order similar in all respects."

are met, however, with the argument that even though those cases were wrongly decided, Congress has adopted the rule which they announced. The argument runs as follows: Many efforts were made to amend the law so as to change the rule announced by those cases; but in every instance the bill died in committee. Moreover, in 1940 when the New Naturalization Act was passed, Congress reenacted the oath in its pre-existing form, though at the same time it made extensive changes in the requirements and procedure for naturalization. From this it is argued that Congress adopted and re-enacted the rule of the Schwimmer, Macintosh and Bland Cases. . . .

"It is at best treacherous to find in Congressional silence alone the adoption of a controlling rule of law. We do not think under the circumstances of this legislative history that we can properly place on the shoulders of Congress the burden of the Court's own error. The history of the 1940 Act is at most equivocal. It contains no affirmative recognition of the rule of the Schwimmer, Macintosh and Bland Cases. The silence of Congress and its inaction are as consistent with a desire to leave the problem fluid as they are with an adoption by silence of the rule of those cases." (66 S.Ct. 826, 830.)

The foregoing statement is particularly applicable here, where it is contended that the silence of the Legislature in 1945 establishes the intention of the Legislature that enacted the provision some eight years previously, even though administrative construction antedating the Green case and in contradiction with it was followed by reenactment of the section without change. It would be as logical to contend that the Legislature thereby adopted the administrative construction. Although legislative silence may sometimes give a clue to legislative intention, it is by no means conclusive. (*Whitcomb Hotel, Inc.* v. *California Emp. Com.*, 24 Cal.2d 753, 756-758 [151 P.2d 233, 155 A.L.R. 405].)

The conclusion that legislative silence constitutes approval of what the courts have done, as Mr. Justice Rutledge so aptly stated in his concurring opinion in *Cleveland* v. *United States*, —— U.S. —— [67 S.Ct. 13, 17, 91 L.Ed. ——], "must be derived by a form of negative inference, a process lending itself to much guesswork."

This view is forcefully amplified in that opinion as follows: "There are vast differences between legislating by doing nothing and legislating by positive enactment, both in the

processes by which the will of Congress is derived and stated and in the clarity and certainty of the expression of its will. And there are many reasons, other than to indicate approval of what the courts have done, why Congress may fail to take affirmative action to repudiate their misconstruction of its duly adopted laws. Among them may be the sheer pressure of other and more important business. (See *Moore* v. *Cleveland R. Co.* (CCA 6th) 108 F.2d 656, 660.) At times political considerations may work to forbid taking corrective action. And in such cases, as well as others, there may be a strong and proper tendency to trust to the courts to correct their own errors, see *Girouard* v. *United States, supra,* as they ought to do when experience has confirmed or demonstrated the error's existence.

"The danger of imputing to Congress, as a result of its failure to take positive or affirmative action through normal legislative processes, ideas entertained by the Court concerning Congress' will, is illustrated most dramatically perhaps by the vacillating and contradictory courses pursued in the long line of decisions imputing to 'the silence of Congress' varied effects in commerce clause cases. That danger may be and often is equally present in others. More often than not the only safe assumption to make from Congress' inaction is simply that Congress does not intend to act at all. (Cf. *United States* v. *American Trucking Assoc.*, 310 U.S. 534, 550 [60 S.Ct. 1059, 84 L.Ed. 1345].) At best the contrary view can be only an inference, altogether lacking in the normal evidences of legislative intent and often subject to varying views of that intent. In short, although recognizing that by silence Congress at times may be taken to acquiesce and thus approve, we should be very sure that, under all the circumstances of a given situation, it has done so before we so rule and thus at once relieve ourselves from and shift to it the burden of correcting what we have done wrongly. The matter is particular, not general, notwithstanding earlier exceptional treatment and more recent tendency. Just as dubious legislative history is at time much overridden, so also is silence or inaction often mistaken for legislation."

Gibson, C. J., and Carter, J., concurred.

Appellant's petition for a rehearing was denied March 17, 1947. Gibson, C. J., Carter, J., and Traynor, J., voted for a rehearing.